1

2

FILED

14 JAN 29 AM 8:28

3

4

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

5

6

7

8

DEPUTY

9

# UNITED STATES DISTRICT COURT

10

# SOUTHERN DISTRICT OF CALIFORNIA

11

12

13

**JOEY MANUEL ESTRADA,**

Civil No.      10-cv-2014-DMS(KSC)

14

**Petitioner,**

15

**REPORT AND RECOMMENDATION
OF UNITED STATES MAGISTRATE
JUDGE RE DENIAL OF HABEAS
PETITION**

**vs.**

16

17

**MATTHEW CATE, Secretary,**

18

**Respondent.**

19

20

Joey Manuel Estrada ("Estrada"), a state prisoner proceeding *pro se* and *in forma pauperis*,

21

seeks 28 U.S.C. § 2254 habeas corpus relief from his September 2005 convictions by a jury of

22

residential burglary, assaults with a firearm, and possession of a firearm by a felon, in San Diego

23

County Superior Court Case No. SCS185128 . He admitted two prior strike convictions and is serving

24

a prison term of 67 years to life.  The California Court of Appeal affirmed the judgment, and the

25

California Supreme Court summarily denied his petition for review.  He unsuccessfully sought

26

collateral relief in the state courts. Estrada filed his federal petition on September 27, 2010 and a First

27

Amended Petition on January 2, 2013 ("FAP"). Respondent filed an Answer acknowledging Estrada's

28

claims are exhausted but opposing any relief, and Estrada filed a Traverse. In consideration of the case

filings, review of the entire trial and post-trial record, prior proceedings in this Court, and controlling

legal authority, it is recommended that the Petition be **DENIED**.

## I.     BACKGROUND

### A.     Factual Background

In its unpublished decision affirming the judgment, the California Court of Appeal summarized

the facts of the two incidents joined for trial in Estrada's criminal case. (Lodg. No. 4 (Cal. Ct. App.

Case No. D049579, Jun. 16, 2008), slip op.) On federal habeas review, state appellate courts' findings

of historical fact, including inferences properly drawn from these facts, are entitled to a statutory

presumption of correctness, rebuttable by the petitioner only upon a showing of error "by clear and

convincing evidence." 28 U.S.C. §2254(e)(1); Parke v. Raley, 506 U.S. 20, 35-36 (1992); *see also*

Moses v. Payne, 555 F.3d 742, 746, n.1 (9th Cir. 2009).

> Estrada's convictions arose from two separate incidents. Counts 3 through 7 (the assault with a firearm and possession of a firearm convictions) arose from an incident on November 4, 2002. Count 1 (residential burglary) arose from an incident on May 29, 2004. Each incident is recounted separately below.
>
> On the night of November 4, 2002, Juan Silva, Car[lo]s Anzar and Estrada were with Chrispina Sanchez in her home. Estrada began to argue with Sanchez about a stolen van that belonged to Sanchez's cousin. Estrada appeared to be getting "a little out of control," and Silva told Estrada to calm down. Estrada responded that Silva should "shut the fuck up." Estrada then pulled out a semiautomatic handgun and pointed it at Sanchez, Silva and Anzar. Estrada approached Silva, and hit him in the head repeatedly with the butt of the gun. Silva suffered a gash on his head that required medical attention.
>
> In the early morning hours of May 29, 2004, Maria Oceguera heard a noise coming from the garage of her home. She opened the garage door and found Estrada standing inside. Maria called to her husband, Javier Oceguera, Sr. for assistance. Maria testified that Estrada grabbed her arm to prevent her from doing so. Javier appeared and, after a short conversation, asked Estrada to leave; Estrada complied. After Estrada left, Javier realized that a videocassette recorder was missing from the garage and a car in the garage had been damaged. In addition, the lock to the garage door had been pried open and damaged.

(Lodg. No. 4 at 2-3 (footnote omitted).)

### B.     Procedural Background In State Court

In a fourth amended information, Estrada was charged on April 6, 2005 with eight violations

of the California Penal Code arising from the two incidents: (1) residential burglary (§§ 459, 460);

(2) false imprisonment (§§ 236, 237(a)); (3) through (6), assault with a firearm or a semi-automatic

firearm (§ 245(b)); (7) possession of a firearm by a felon (§ 12021(a)(1)); and (8) assault with a deadly weapon and by means of force likely to produce great bodily injury (§ 245(a)(1)). (Lodg. No. 16, CT vol. 1, 0086-0093.)  Enhancements were alleged as to counts three, four, and eight that Estrada personally inflicted great bodily injury on the victim (§ 12022.7); as to count three that he personally used a firearm (§ 12022.5(a)); and as to count eight that he personally used a deadly weapon (§ 1192.7(c)(2)). (Lodg. No. 16, CT vol. 1 at 86-89.) The information also alleged he had served three prior prison terms, had two prior serious felony convictions, and had two strike priors. (Id. at 89-92.)

Estrada's trial began April 6, 2005.  The jury informed the court on April 20, 2005 that they were deadlocked, and the court declared a mistrial. (Lodg. No. 16, CT vol. 3 at 563.)

### 1.   Estrada's Second Trial

Estrada's retrial began August 24, 2005. (Lodg. No. 16, CT vol. 3 at 569.) He had testified in his own behalf at his first trial, but he did not testify at his second trial. The jury nonetheless heard his version of the events associated with both the 2002 assault charges and the 2004 burglary charges as read into the record from the first trial transcript, primarily by the prosecution. Estrada does not challenge the sufficiency of the evidence to support his convictions. However, the federal habeas standards of review for certain of his FAP claims rejected by the state courts without a reasoned decision require that the Court examine the evidentiary record in some detail.

### a.   The Assault Case

The prosecution presented its case on the 2002 assault charges primarily through the percipient witnesses' and law enforcement officers' testimony. All three witness/victims testified at trial: Carlos Anzar (Lodg. No. 17, RT vol. 8 of 23 at 579-610, id., RT vol. 9 of 23 at 905-937), Chrispina Sanchez (id., RT vol. 9 of 23 at 752-825), and Juan Silva (id., RT vol. 9 of 23 at 854- 893).[1]  Sanchez, in particular, provided testimony materially inconsistent with her statements at the time of the assault and

---

[1] Respondent's Lodgment No. 17 is comprised of 23 volumes of reporter's transcripts. Respondent's assigned volume number on the Lodgment No. 17 identification label affixed to each does not always correspond to the court reporters' volume number on the document face. All citations in this Report and Recommendation to a particular reporter's transcript in the format "RT vol. [#] of 23" refer to the Respondent's Lodgment No. 17 assigned volume numbers. Several other lodged reporters' transcript volumes are not part of the Lodgment No. 17 numbering sequence.

with portions of her testimony at the first trial.  Both Anzar and Sanchez displayed considerable reluctance at having to appear against Estrada, and both referred to the consequences in their milieu of being a "rat" or a snitch and their fear of those consequences.  Details of Sanchez's trial testimony is discussed in more detail in connection with Estrada's Ground Seven prosecutorial misconduct theory on his claim the prosecutor purportedly presented perjured testimony.

The law enforcement witnesses testified consistently at both of Estrada's trials, relying on their contemporaneous records from the incident.  Responding officer Mark Chavez testified that Chrispina Sanchez appeared to be upset and fearful as she described Estrada's assault.  She told the officer that he had pointed a gun at all of them (herself, Juan Silva, and Carlos Anzar) before striking Silva "in the head with the pistol end of the grip, approximately two to three times."  She stated that she pleaded with Estrada to put the gun away and that he told her he didn't care if she called the police, then tucked his gun back into his waistband and quickly left.  (RT vol. 9 of 23 at 826-841.)

Sanchez similarly told another testifying police officer that Estrada came to her house to talk about her cousin's stolen van, they argued about it, Silva tried to step in and break it up, then Estrada got really angry and pulled a gun, pointed it at all of them, started hitting Silva in the head, then put the gun back in his waistband and drove away.  (RT vol. 9 of 23 at 894-904.)  A third  police officer testified that both Silva and Anzar gave him substantially similar accounts of the incident: that Estrada and Chrispina got into an argument, Silva tried to step in, Estrada got angry, then pulled out a handgun and pointed it at all three of them before hitting Silva in the head with it.  (Id. at 938-946.)

At the second trial, Sanchez denied a gun was involved in the assault.  She was impeached with her prior inconsistent statements.  She attempted to evade, among other things, the memorialized statements she made to the 911 operator at the time of the assault, in particular her statements about Estrada having the gun and seeing him hit Silva in the head with it, even stating, when pressed, that she had "lied" in her original version of events.  The prosecutor argued to the jury: "Were they telling the truth [the night it happened], or were they telling the truth when they came in here and lied to you? Those are what you have to decide." (RT vol. 16 of 23 at 2627.)

The defense theory of the assault case, as memorialized in Estrada's prior trial testimony, was that Silva had the gun and Estrada acted in self-defense.  He testified that he had decided to go to

1    Sanchez's house in the early morning hours of November 4, 2002 because an acquaintance had called

2    him about the location of her cousin's missing van, and he wanted to help her get it back. He described

3    "an incident with Juan Silva and three other guys that were looking for me in a van" about a week

4    before when they had gone to a friend's house and displayed a gun, and he "didn't want any more

5    incidents happening for anyone."[2]  (RT vol. 16 of 23 at 2515-2518.)

6         In his version of the assault incident, Estrada knocked on Chrispina's door. He was surprised

7    to find Juan Silva there. Estrada told Chrispina they found the van and she could call her cousin.

8    While they waited for her cousin to call back, Estrada felt Silva "got jealous" of Estrada "kind of

9    talking close to Chrispina". Chrispina and Silva continued to get high on meth.  (RT vol. 16 of 23 at

10   2519-2526; *see also* id. at 2538-2541.)

11        Q:  Then -- did something happen?

12        A:  Yes. As I was talking to [Silva], I was bringing up the situation about the van again
          . . .[¶] with Juan. I kind of told him, you know what is wrong with you? Why did you

13        do that?  And then he tells me -- he told me to shut the fuck up. . . . [¶]  I turned around
          and told Chrispina, did you hear this punk, and as I turned around, Juan had a gun on

14        me. When I turned, I noticed that the gun was on me because I turned and it hit me in
          the mouth, okay?

15        . . . .

16        Q:  . . . He was holding something?

17        A:  He was holding that fake gun.  I didn't know it was fake at the time, but he had a
          gun on me when I turned around, it hit me in the mouth . . .

18
          A:  Then I grabbed the gun like this and he -- I had grabbed it with two hands and I
19        pushed him back. . . .

20        Q:  Weren't you afraid that it was a real gun?

21        A:  Yeah, I was afraid. . . .
          . . . .

22
          Q:  Did he fall to the ground?
23
          A:  Yes, he did, and I went with him. . . . [¶]  I demobilized him from the gun. I got the
24        gun.

25        Q:  You took the gun from him?

26

27
     ───────────────────────
          [2]  Sanchez characterized Estrada as "upset" about the fact that Silva and others had gone to Estrada's
28   friend's house looking for him and the van. (RT vol. 9 of 23 at 805-809, 824-825.)

1   A:  Yes, I got up and I heard Chrispina yell at me.  She screamed and I had the gun in
    my hand, and I was . . . getting him off the floor. . . .  I was freaked out so I opened the
2   [sliding glass door] and I took off, you know, from the crash and her scream and I am
    going to call the police. . . .  So I. . . got in my car and left. . . . [¶]  I [did not] realize[]
3   it was not a real gun until I got to my car.
    . . . .

4
    Q:  Did it feel heavy?
5
    A:  At the time when I had it in my hand?  It wasn't real heavy.  It was like -- I don't
6   know, it was like a hard plastic.  It was a hard plastic.

7   (RT vol. 16 of 23 at 2526-2532.)

8                       **b.    The Burglary Case**

9       The prosecution theory was that Estrada broke into the Oceguera garage to steal things.  Estrada

10  had testified at his first trial that he went there to obtain methamphetamine from Javier Oceguera, not

11  to steal, the door into the garage was open when he arrived at the Oceguera property, and Oceguera

12  was inside the garage.  (*See* RT vol. 15 of 23 at 2254, RT vol. 12 of 23 at 1686-1701, RT vol. 17 of

13  23 at 2802-2810.)  Capitalizing on Estrada's admission, the prosecutor argued at the second trial:

14  "[Estrada] gets caught in the Oceguera garage, the door is broken in, the stuff is piled up, the stereo

15  is missing, and basically what he says is, no, I went over there to buy dope and Oceguera was in there

16  and it didn't happen that way."  Even if Estrada did not break into the Oceguera garage with the intent

17  to steal and the jury decided he "told the truth in the last trial about going there to get dope, he's still

18  guilty of burglary."  (RT vol. 16 of 23 at 2626-2627.)  After the defense rested, counsel and the court

19  engaged in considerable discussion concerning the prosecution's dual theories of felony burglary, the

20  impeachment value of Estrada's contradictory explanations of his presence in the Oceguera garage, and

21  the propriety of associated jury instructions.  (RT vol. 15 of 23 at 2411-2418.)  The court ultimately

22  explained to the jury in special instructions:

23          The prosecution has two separate theories of liability as to Count 1, the alleged
        burglary of the Oceguera garage.  First, that the defendant entered the garage with the
24      specific intent to steal property that belonged to the Ocegueras; second, that the
        defendant entered the garage with the specific intent to possess methamphetamine
25      purchased from Javier Oceguera.

26          There are two exceptions to the general rule that a person who enters a building
        with the intent to commit a theft therein is guilty of burglary. . . [:] one, when the
27      person has an unconditional possessory right to enter as the occupant of that building;
        or two, when the person is invited in by the occupant of that building who knows of
28      and endorses the felonious intent.

                                        6                                    10cv2014-DMS(KSC)

1     . . .

2               In defendant's prior trial, the defense had not requested that the jury be instructed on the above-stated defense to the prosecution's second theory of liability as to Count 1. Defendant's testimony from his prior trial, which has been read into evidence in this trial, was made without the benefit of this more complete statement of the law.

5     (RT vol. 17 of 23 at 2758-2759; *see* Lodg. No. 16, vol. 2 of 3 at 236.)

6          On September 19, 2005, after deliberating less than a day and a half, the jury acquitted Estrada

7     of count two (false imprisonment associated with his interactions with Mrs. Oceguera) and count eight

8     (assault with a deadly weapon associated with the incident at Chrispina Sanchez's house), but found

9     him guilty of counts one and three through seven, and found the alleged conduct enhancements to be

10    true. (Lodg. No. 16, CT vol. 2 at 285, 287, 291-304; id., CT vol. 3 at 596-597; *see also* RT vol. 20

11    of 23 at 3273-3282.) Estrada admitted the charged priors in a bifurcated proceeding. (Lodg. No. 16,

12    CT vol. 3 at 598; *see* RT vol. 18 of 23; *see also* Traverse 2, ECF No. 95.)[3] The parties stipulated

13    during the trial that "prior to the Chrispina incident, in November of 2002, the defendant had lawfully

14    been convicted of a felony offense." (RT vol. 14 of 23 at 2098.) On September 22, 2006, the court

15    denied the written new trial motion brought by defense counsel, having previously construed and

16    denied Estrada's arguments at an intervening Marsden motion hearing to be an oral motion for a new

17    trial, then sentenced him to fifty-years-to-life, plus seventeen years, in state prison. (Lodg. No. 16, CT

18    vol. 3 at 503-506, 610-612; *see* RT vol. 23 of 23.)

19            **2.**   **Post-Trial State Court Proceedings**

20          Estrada appealed his convictions, alleging five grounds for relief: (1) the prosecutor used

21    peremptory challenges to exclude Hispanics from the jury in violation of his constitutional rights; (2)

22    "unreasonable and unjustified" delay in bringing him to trial on the 2002 charges violated his speedy

23    trial and due process rights; (3) improper joinder under California law of the 2002 assault charges with

24    the 2004 burglary charges; (4) improper admission of other uncharged offenses; and (5) improper jury

25    instruction on flight after crime. (Lodg. No. 1.) The court of appeal affirmed the convictions in an

26

27

28       [3] Page numbers for docketed materials cited in this Report and Recommendation refer to those imprinted by the Court's electronic case filing system.

1    unpublished decision, the only reasoned decision from the state courts on the merits of any of Estrada's

2    post-conviction claims. (Lodg. No. 4 (Cal. Court of Appeal Case No. D049579) (Jun. 16, 2008), slip

3    op.) Estrada then raised all but the jury instruction challenge in a Petition For Review in the California

4    Supreme Court. (Lodg. No. 5.) That court summarily denied review. (Lodg. No. 6 (Cal. Supreme Ct.

5    Case No. S165428) (Sept. 10, 2008).)

6        Estrada next filed a habeas corpus petition in San Diego County Superior Court, reasserting

7    the same claims he had unsuccessfully presented on direct appeal. (Lodg. No. 7.) The superior court

8    denied the petition, characterizing the claims as identical to those Estrada had raised on direct review

9    and declining to revisit any of them on the merits because each had been "considered and rejected on

10    appeal." (Lodg. No. 8 (San Diego County Superior Court Case No. HSC11107 (Dec. 22, 2009), slip

11    op. at 2.) The court relied on the California rule that "[i]n general, habeas corpus cannot serve as a

12    second appeal, and matters that were raised and rejected on appeal are not cognizable on state habeas

13    corpus in the absence of special circumstances." (Id. at 2-3, *citing, inter alia*, In re Waltreus, 62 Cal.2d

14    218 (1965).) *See* In re Harris, 5 Cal.4th 813, 829 (Cal. 1993) (the Waltreus rule, provides that "in the

15    absence of strong justification, any issue that was *actually* raised and rejected on appeal cannot be

16    renewed in a petition for a writ of habeas corpus"); *see also* Park v. California, 202 F.3d 1146, 1151

17    (9th Cir. 2000) ("In California, a convicted defendant desiring to bring claims in a state habeas petition

18    must, if possible, have pursued the claims on direct appeal from his conviction").

19        Estrada filed a second habeas petition in the superior court on March 4, 2010, advancing six

20    discrete claims: (1) due process and fair trial violations for the trial court's "erroneous refusal to

21    exclude or at least limit evidence of unproven bad conduct or character," in reliance on sections of the

22    California Evidence Code; (2) undue prejudice from inference of gang membership or affiliation; (3)

23    the prosecutor's use of peremptory challenges violated his constitutional rights; (4) speedy trial and

24    due process rights violations due to delayed prosecution of the 2002 charges; (5) improper joinder of

25    the 2002 and the 2004 charges under Cal. Penal Code § 954; and (6) improper jury instruction on flight

26    after crime. (Lodg. No. 9.) The superior court assigned the same case number as his first habeas

27    petition and denominated the filing "Second Petition." (Lodg. No. 10 (San Diego County Superior

28    Court Case No. HSC11107 (Second Petition) (Apr. 1, 2010), slip op.) The court again denied the

1  petition on procedural grounds and without reaching the merits, with citations *inter alia* to In re Clark,

2  5 Cal.4th 750, 767-68 (1993) ("[A]bsent a change in the applicable law or the facts, the court will not

3  consider repeated applications for habeas corpus presenting claims previously rejected" nor "newly

4  presented grounds for relief which were known to the petitioner at the time of a prior collateral attack

5  on the judgment") and Waltreus, 62 Cal.2d 218.  The opinion discussed the "four exceptions to the

6  '*Waltreus* rule,' " concluding that the Second Petition failed to state a *prima facie* case for relief

7  because it satisfied none of those special circumstances.  (Id., slip op. at 3-4.)  The court found that

8  Estrada was improperly engaging in "piecemeal litigation" without identifying any change in the facts

9  or the law to justify the successive petition or any "special circumstances to warrant cognizance of the

10  arguments that were made and rejected on appeal."  (Id., slip op. at 1-4.)

11      Estrada next filed a habeas petition in the California Supreme Court, on September 28, 2010.

12  (Lodg. No. 11 (Cal. Supreme Court Case No. S186810).)  That petition alleged:  (1) the prosecutor

13  unconstitutionally exercised his peremptory challenges; (2) a violation of his speedy trial right with

14  respect to the 2002 charges; (3) abuse of discretion and violation of his constitutional rights when the

15  trial court refused to sever for trial the 2002 incident charges and the 2004 incident charges; (4) due

16  process and fair trial right violations through admission of evidence of other uncharged offenses;

17  (5) constitutional violations through admission of unverified evidence of his having been housed in

18  jail with a Mexican Mafia associate; and (6) improper instruction on flight, as an alleged infringement

19  of his due process and fair trial rights requiring that the prosecution prove every element of an offense

20  beyond a reasonable doubt.  (Id.)  Respondent represents:  "[t]he court denied the petition because the

21  petition did not serve as a second appeal," citing Waltreus, 62 Cal.2d at 225.  (Ans. 17, ECF No. 78-1,

22  *citing* Lodg. No. 12; *see* ECF No. 33 at 2.)[4]

23  / / /

24

---

25      [4]  The lodgments in this case arrived in several installments.  Respondent's first appearance was to oppose Estrada's Motion For Stay and Abeyance on January 13, 2011, accompanied by a Notice of Lodgment

26  identifying Nos. 1-12. (ECF Nos. 14, 15.)  Respondent filed a "Supplemental Notice of Lodgment" on October 11, 2011, listing an update to Lodgment No. 12 to reflect that the petition was denied.  (ECF No. 33.)  The

27  updated Lodgment No. 12 page appears to have gone astray, but there is no dispute that the petition was summarily denied.  Respondent again supplemented the lodgments on April 3, 2012 (ECF No. 51) and on

28  January 18, 2013 (ECF No. 79). The latter lodgment provided a new Lodgment No. 14.

1    Undaunted, Estrada filed a second habeas petition in the California Supreme Court on October

2    11, 2011. (Lodg. No. 13 (Cal. Supreme Court Case No. S197184).) There he alleged: (1) arguments

3    for "equitable tolling", citing the federal habeas statute; (2) that the trial judge erred by admitting into

4    evidence a script found among the belongings of his former prison cell mate, Miguel Thompson that

5    Estrada contends invaded the attorney/client privilege; (3) prosecutorial misconduct because a witness

6    lied; and (4) ineffective assistance of trial counsel. (Id.) A February 22, 2012 docket entry in that case

7    summarily states: "Petition for writ of habeas corpus denied." (Lodg. No. 15, *also lodged as hand-*

8    *labeled* "Lods. [sic] #14".)

9    **C.    Procedural Background In Federal Court**

10   Extracting from the extensive docket in this case the salient activity for purposes of this Report

11   and Recommendation, Estrada filed his federal petition on September 27, 2010, alleging six grounds

12   for relief: (1) unconstitutional use of peremptory challenges to exclude Hispanic jurors; (2) due process

13   and speedy trial right violations due to the belated trial of the 2002 incident charges; (3) abuse of trial

14   court discretion and violation of constitutional rights in failing to sever trial of the 2002 charges from

15   the 2004 charges; (4) prejudicial admission of uncharged crimes evidence at trial; (5) unconstitutional

16   admission by the trial court of "unverified evidence of petitioner's housing with Mexican Mafia"; and,

17   (6) that the giving of a jury instruction on flight violated his constitutional rights. (Petition 6-11, 23,

18   ECF No. 1.) He moved for stay and abeyance to permit the California Supreme Court to complete "a

19   final review of his issues" in that court's Case No. S186810, filed September 29, 2010. (ECF No. 7.)

20   He filed his points and authorities in support of the stay on December 1, 2010. (ECF No. 13.)

21   Respondent presented an untimeliness argument and further opposed the motion on grounds Estrada

22   failed to show good cause for the request as required by Rhines v. Weber, 544 U.S. 269, 277 (2005).

23   Respondent argued: "[S]tay and abeyance is only appropriate when the district court determines there

24   was good cause for the petitioner's failure to exhaust his claims first in state court", only one of his

25   claims (the giving of the flight jury instruction) was not exhausted, and the failure to exhaust could not

26   be excused because it was a claim he had raised on direct appeal. (ECF No. 14.)

27   Respondent also alluded in its opposition filing to the probability that Estrada's unexhausted

28   claim was procedurally barred under state law (ECF No. 14 at 7-8), but does not appear to have

1   elaborated on the procedural default doctrine or its application to any of Estrada's particular claims in

2   any subsequent arguments to this Court in this case, despite an invited opportunity to do so. A Report

3   and Recommendation ("R&R") filed April 13, 2011 by the magistrate judge then assigned to this case

4   recommended granting Estrada's motion for stay and abeyance or, in the alternative, "should the

5   California Supreme Court rule on Petitioner's pending state habeas petition prior to the District Court

6   addressing this Report and Recommendation, then the motion for stay and abeyance should be denied

7   as moot, without prejudice to Respondent raising the issues of statute of limitations and procedural

8   default in a motion to dismiss." (ECF No. 22.) Estrada informed the court on June 7, 2011, before

9   the stay motion was decided, that his petition in California Supreme Court Case No. S186810 had been

10  denied in May 2011. (ECF No. 24.) By Order entered July 25, 2011, this Court adopted the R&R,

11  denied the motion to stay as moot and required a response to the petition. (ECF No. 27.)

12      On October 11, 2011, Respondent filed a motion to dismiss on grounds Estrada filed his federal

13  petition after expiration of the AEDPA one-year statute of limitations and argued he was not entitled

14  to statutory or equitable tolling of that deadline. Respondent raised no procedural default argument.

15  (ECF No. 32-1.) Estrada opposed the motion on December 22, 2011, arguing extraordinary

16  circumstances entitled him to equitable tolling. (ECF No. 37.) In the meantime, on December 12,

17  2011, he had filed a new federal habeas corpus action here, challenging the same conviction as in this

18  case. (Case No. 11cv2900-LAB(WMC).) The new petition was dismissed without prejudice by Order

19  entered December 16, 2011, with instructions that if Estrada wanted to challenge his state conviction

20  in Case No. SCS185128 on new grounds, he would have to obtain leave to file an amended petition

21  in this case. (Id., ECF No. 4.) On January 4, 2012, before the motion to dismiss in this case was

22  decided, Estrada filed another motion for stay and a motion for leave to file an amended petition in this

23  case, in reliance on the Order dismissing his second federal petition. (Case No. 10cv2014-

24  DMS(CAB), ECF No. 38.) On January 24, 2012, the magistrate judge then assigned to this case set

25  a briefing schedule for the stay motion and ordered that the dismissed federal petition be filed in this

26  case docket as "Proposed Supplemental Petition." (ECF No. 40 at 2.)

27      On March 19, 2012, Estrada notified the Court that the California Supreme Court had denied

28  his habeas petition in Case No. S197184 on February 22, 2012, and that all his claims were

1   consequently exhausted. However, he represented that a stay and abeyance "was still necessary"

2   because he needed "an evidentiary hearing before I put on evidence that would exonerate me, on newly

3   discovered evidence." (ECF No. 46 at 1-2.) Respondent opposed the motion on grounds Estrada

4   failed to satisfy the good cause showing required to warrant a stay and reasserting and supplementing

5   the untimeliness demonstration from its still-pending motion to dismiss (ECF No. 32) as additional

6   grounds for denial. (ECF Nos. 50, 50-1: "In any event, there is no reason to grant a Rhines stay

7   because all of Estrada's claims are already untimely".) In his Reply, Estrada reiterated his need for an

8   evidentiary hearing. (ECF No. 52.) The disposition of his several evidentiary hearing requests is also

9   discussed separately below, in connection with his renewed request in his Traverse.

10          By Order entered September 19, 2012, the undersigned magistrate judge denied as moot

11   Estrada's motion for a stay, denied Respondent's motion to dismiss (finding Estrada was entitled to

12   equitable tolling of a sufficient duration to render his federal petition timely file), and granted Estrada's

13   motion to amend his petition. (ECF No. 56.) Estrada filed his FAP on January 2, 2013. (ECF No.

14   74.) Respondent filed an Answer to the FAP on January 18, 2013. (ECF No. 78.) Estrada filed his

15   Traverse on July 15, 2013. (ECF No. 95.)

16          Despite the procedural history in the state courts, Respondent has not relied on procedural

17   default as a ground for denying federal habeas relief on any of Estrada's claims. [5] "As a rule, a state

18   prisoner's habeas claims may not be entertained by a federal court 'when (1) a state court [has]

19   declined to address [those] claims because the prisoner had failed to meet a procedural requirement,'

20   and (2) 'the state judgment rests on independent and adequate state procedural grounds.' " Maples v.

21

22

---

23   [5] Procedural default can foreclose federal habeas review if a state law rule invoked to avoid reaching
     the merits of a federal claim is "adequate and independent" from the federal question. The court of appeal

24   alluded to such a procedural obstacle in denying Estrada's Second Petition seeking habeas relief from that
     court, rejecting the claims with citations to In re Clark, 5 Cal.4th at 767-75 (1993) and Waltreus, 62 Cal.2d 218.

25   Those procedural rules have been found to be adequate and independent state law grounds for rejecting federal
     constitutional claims. See Park, 202 F.3d at 1151. The California Supreme Court summarily denied relief each

26   time Estrada sought relief there. When a higher court subsequently denies the same claims as those addressed
     in a reasoned decision by a lower court, the "look through" doctrine permits the presumption that the

27   subsequent denial rests on the same ground, whether the reasoned decision was on the merits or articulated to
     be an application of procedural default.   Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991) ("Similarly, where

28   . . . the last reasoned opinion on the claim explicitly imposes a procedural default, we will presume that a later
     decision rejecting the claim did not silently disregard that bar and consider the merits").

1  Thomas, 132 S. Ct. 912, 922 (2012), *quoting* Walker v. Martin, __ U.S. __, 131 S. Ct. 1120, 1127

2  (2011).  Nevertheless, a federal reviewing court is not required to raise *sua sponte* a petitioner's

3  potential procedural default.[6]  Trest v. Cain, 522 U.S. 87, 89 (1997) ("[I]n the habeas context, a

4  procedural default, that is, a critical failure to comply with state procedural law, is not a jurisdictional

5  matter," and the Court may choose to reach the merits of a petitioner's defaulted claims); *see* Coleman

6  v. Thompson, 501 U.S. 722, 730-31 (1991). Respondent may be found to have waived the issue of

7  procedural default.  Insyxiengmay v. Morgan, 403 F.3d 657, 665-666 (9th Cir. 2005) ("Procedural

8  default is an affirmative defense, and the *state* has the burden of showing that the default constitutes

9  an adequate and independent ground").  Relying on Respondent's apparent abandonment of any

10 procedural default argument, and in the interest of finality in the disposition of the issues presented,

11 the Court elects not to apply that doctrine *sua sponte*.

12      Estrada's FAP presents eight grounds for relief.  Ground One alleges the prosecutor's use of

13 peremptory challenges to exclude Hispanics from the jury violated his Sixth and Fourteenth

14 Amendment and equal protection rights.  Ground Two alleges a violation of his right to a speedy trial.

15 Ground Three alleges improper joinder for trial of his two criminal cases violated his due process, fair

16 trial, and equal protection rights.  Ground Four alleges prejudicial admission of evidence. Ground Five

17 alleges the trial court improperly instructed the jury on flight after crime.  Ground Six alleges instances

18 of judicial misconduct and abuse of discretion in the course of the trial.  Ground Seven alleges

19 prosecutorial misconduct.  Ground Eight alleges ineffective assistance of trial counsel.

20 **II.    DISCUSSION**

21      **A.    Standards Of Review For Federal Habeas Relief**

22          **1.    Antiterrorism and Effective Death Penalty Act ("AEDPA")**

23      The AEDPA governs review of Estrada's claims because he filed his federal habeas petition

24

---

25      [6] On federal habeas review, a petitioner called upon to demonstrate excuse for the procedural default
in state court of a federal claim can overcome that bar if the petitioner can satisfy cause and prejudice
26 showings. Bennett v. Mueller, 322 F.3d 573, 580 (9th Cir. 2003).  Respondent here does not raise procedural
default as a ground to deny any claim in the FAP.  No procedural default analysis in the federal habeas
27 proceedings in the three years this case has been pending supplies any law of the case on any of Estrada's
claims.  This Court would find that Respondent has waived that argument, and Estrada was thus not called
28 upon to make a cause and prejudice showing.

after that statute's 1996 effective date. <u>Lindh v. Murphy</u>, 521 U.S. 320, 322-23 (1997). AEDPA imposes a " 'highly deferential standard for evaluating state-court rulings,' " requiring "that state-court decisions be given the benefit of the doubt." <u>Woodford v. Visciotti</u>, 537 U.S. 19, 24 (2002), *quoting* <u>Lindh</u>, 521 U.S. at 333 n.7. "AEDPA prevents defendants -- and federal courts -- from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts." <u>Renico v. Lett</u>, 559 U.S. 766, 779 (2010). "[H]abeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." <u>Harrington v. Richter</u>, 562 U.S. __, 131 S.Ct. 770, 786 (2011), *quoting* <u>Jackson v. Virginia</u>, 443 U.S. 307, 332 n.5 (1979) (Stevens, J., concurring).

A federal court "shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Federal habeas courts may not "reexamine state-court determinations on state-law questions." <u>Estelle v. McGuire</u>, 502 U.S. 62, 67-68 (1991); *see* <u>Bradshaw v. Richey</u>, 546 U.S. 74, 76, (2005) ("[A] state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus"). Cursory references to federal rights are insufficient to state a constitutional violation, and conclusory statements unsupported by factual allegations showing entitlement to relief are inadequate to maintain a claim. Rule 2(c), 28 U.S.C. foll. § 2254.

"By its terms § 2254(d) bars relitigation of any claim 'adjudicated on the merits' in state court, subject only to the exceptions in §§ 2254(d)(1) and (d)(2)." <u>Richter</u>, 131 S.Ct. at 784. Federal habeas relief from a state court's adjudication of the merits of a federal claim is available under the first AEPDA exception only if the state court result "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); *see* <u>Lockyer v. Andrade</u>, 538 U.S. 63, 73-76 (2003); *see also* <u>Williams v. Taylor</u>, 529 U.S. 362, 405-06 (2000). A lack of holdings from the Supreme Court on the issue presented precludes relief under 28 U.S.C. § 2254(d)(1). <u>Carey v. Musladin</u>, 549 U.S. 70, 77 (2006); *see* <u>Moses</u>, 555 F.3d at 754 ("[W]hen a Supreme Court decision does not 'squarely address[]' the issue in the case it cannot be said, under AEDPA, there is 'clearly established' Supreme Court

1   precedent addressing the issue," and a federal habeas court "must defer to the state court's decision")

2   (citations omitted).   Under the 28 U.S.C. § 2254(d)(1) exception, to be found an "unreasonable

3   application" of the precedent, the state court result must have been "more than incorrect or erroneous;"

4   it "must have been 'objectively unreasonable.' "   Wiggins v. Smith, 539 U.S. 510, 520-21 (2003)

5   (citations omitted); Renico, 130 S.Ct. at 1866; see Richter, 131 S.Ct. at 786-87 ("[A] state prisoner

6   must show that the state court's ruling on the claim being presented in federal court was so lacking in

7   justification that there was an error well understood and comprehended in existing law beyond any

8   possibility for fairminded disagreement"); see also Yarborough v. Alvarado, 541 U.S. 652, 664 (2004).

9   Although Section "2254(d) mandates that only Supreme Court precedential holdings clearly establish

10   a right, our circuit precedent may provide persuasive authority for purposes of determining whether

11   a state court decision is an unreasonable application of Supreme Court precedent."   Mendez v.

12   Knowles, 556 F.3d 757, 767 (9th Cir. 2009).

13         Under the second AEDPA exception, "a decision adjudicated on the merits in a state court and

14   based on a factual determination will not be overturned on factual grounds unless objectively

15   unreasonable in light of the evidence presented in the state-court proceeding, § 2254(d)(2)."   Miller-El

16   v. Cockrell, 537 U.S. 322, 340 (2003).   The question "is not whether a federal court believes the state

17   court's determination was incorrect but whether that determination was unreasonable -- a substantially

18   higher threshold."   Schriro v. Landrigan, 550 U.S. 465, 473 (2007) (AEDPA "requires federal habeas

19   courts to presume the correctness of state court's factual findings unless applicants rebut this

20   presumption with 'clear and convincing evidence' "), quoting 28 U.S.C. § 2254(e)(1).

21         Even if constitutional error is found, federal habeas courts reviewing prisoners' claims under

22   28 U.S.C. § 2254 "must assess the prejudicial impact of constitutional error in a state-court criminal

23   trial under the 'substantial and injurious effect' standard set forth in" Brecht v. Abrahamson, 507 U.S.

24   619, 637-38 (1993). Fry v. Pliler, 551 U.S. 112, 121 (2007); see Baines v. Cambra, 204 F.3d 964, 977

25   (9th Cir. 2000) (the Ninth Circuit applies the Brecht harmless error standard "uniformly in all federal

26   habeas cases under § 2254").   Thus, even if constitutional error occurred, the petitioner must still

27   demonstrate that the error satisfies the Brecht standard before habeas relief is available.

28   / / /

## 2.    AEDPA Deference And De Novo Review

An unexplained denial of an original habeas petition by the California Supreme Court is presumed to be an adjudication on the merits of the federal claims presented which is entitled to AEDPA deference, unless "there is reason to think some other explanation for the state court's decision is likely." Richter, 131 S.Ct. at 785; *see* Walker, 131 S.Ct. at 1124 ("A spare order denying a petition without explanation or citation ordinarily ranks as a disposition on the merits," in which case the federal habeas court "looks through" to the last reasoned state court decision addressing the federal claim). "Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding the judgment or rejecting the same claim [are presumed to] rest upon the same ground." Ylst, 501 U.S. at 803.

When there is an adjudication on the merits but no articulated reason for the decision, a federal habeas court reviews the complete record to determine whether the result comports with federal law, applying AEDPA deference to the state court result. Johnson v. Williams, __ U.S. __, 133 S. Ct. 1088, 1091 (2013); *see* Greene v. Lambert, 288 F.3d 1081 1089 (9th Cir. 2002). In the case of silent denials, the federal habeas court "independently review[s] the record to determine whether the state court clearly erred in its application of controlling federal law," but "we still defer to the state court's ultimate decision." Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002), *quoting* Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000). "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003); *see* Richter , 131 S.Ct. at 786.

However, if the state courts did not adjudicate the merits of a question of federal constitutional law presented to it, the deference scheme of 28 U.S.C. § 2254(d) does not apply to the state court result. *See* Pirtle, 313 F.3d at 1167-68 (holding that "when it is clear that a state court has not reached the merits of a properly raised issue, we must review it de novo" although, "under AEDPA, factual determinations by the state court are presumed correct and can be rebutted only by clear and convincing evidence"); *see* Nulph v. Cook, 333 F.3d 1052, 1057 (9th Cir.2003) (same); *see also* Ayala v. Wong, 730 F.3d 831 (9th Cir. 2013).

16

Estrada eventually presented all the claims in his FAP to the California Supreme Court, and they have been deemed exhausted, but the state high court was silent regarding its rationale each time it denied him relief. Some of Estrada's federal claims were clearly addressed on the merits in the only reasoned state court decision reaching the merits of any of Estrada's FAP claims from the California Court of Appeal on direct review. (*See* Lodg. No. 4.) Estrada later added three federal claims on which he received no reasoned decision: ineffective assistance of counsel (FAP Ground Eight), prosecutorial misconduct theories (FAP Ground Seven), and judicial misconduct theories (FAP Ground Six). At least those could be construed as procedurally defaulted under adequate and independent state law grounds, applying the "look through" doctrine. Ylst, 501 U.S. at 803. Nevertheless, in the absence of any procedural default argument from Respondent, and in the interest of finality, the Court assumes, for purposes of this R&R, that Estrada's federal claims were "properly raised" in state court. The Court has applied both independent review of the record as well as alternative *de novo* review where application of the presumption of adjudication on the merits by the state courts is ambiguous. Accordingly, the Court incorporates discussions of the evidence from the record as necessary for thorough consideration of Estrada's claims under both standards of review.

**B.    No Evidentiary Hearing Warranted**

By Order entered March 20, 2013, this Court denied with prejudice Estrada's December 13, 2012 motion for evidentiary hearing predicated on Miguel Thompson's purported willingness to testify at such a hearing that he knows who actually committed the Oceguera burglary. The Court found Estrada failed to present the issue in state court or even in his original petition here, and further, he failed to make the showing required to satisfy 28 U.S.C. § 2254(e). (ECF No. 83.) Estrada moved again for an evidentiary hearing on March 26, 2013, again based on purported new evidence from Miguel Thompson. (ECF No. 87.) On April 2, 2013, the Court again denied him an evidentiary hearing on that ground, and also denied his March 25, 2013 Motion For Stay (ECF No. 85) which contained additional arguments for an evidentiary hearing predicated on allegations of judicial misconduct at his trial. (ECF No. 88.)

Despite the disposition of those prior requests, Estrada renews in his Traverse a request for an evidentiary hearing, positing additional new grounds, in particular associated with his claim of judicial

1  misconduct. (Traverse 3, 35, 45, ECF No. 95.) He contends that the trial judge purportedly "lied to

2  petitioner and lawyer" with respect to the admission of trial Exhibit 11, the police report of the

3  Oceguera burglary, and also improperly "influenced the verdict", alluding to his FAP Grounds Six and

4  Seven. (Id. at 35.) No evidentiary hearing is required to resolve those claims, as discussed below, nor

5  is an evidentiary hearing on this record authorized by AEDPA.

6         AEDPA prescribes the manner in which federal habeas courts must approach the factual record.

7  *See* Baja v. Ducharme, 187 F.3d 1075, 1077 (9th Cir. 1999). In addition to the presumption of

8  correctness attaching to a state court's determination of a factual issue, 28 U.S.C. § 2254(e)(1), section

9  2254(e)(2) substantially restricts "the discretion of federal habeas courts to take new evidence in an

10  evidentiary hearing." Cullen v. Pinholster, __ U.S. __, 131 S.Ct 1388, 1400-01 (2011). "If the

11  applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall

12  not hold an evidentiary hearing on the claim" unless the applicant shows that the claim relies on a new

13  rule of constitutional law "made retroactive on collateral review by the Supreme Court, that was

14  previously unavailable," or "a factual predicated that could not have been previously discovered

15  through the exercise of due diligence." 28 U.S.C. § 2254(e)(2)(A). In the latter circumstance, the

16  petitioner must also demonstrate that "the facts underlying the claim would be sufficient to establish

17  by clear and convincing evidence that but for constitutional error, no reasonable fact-finder would have

18  found the applicant guilty of the underlying offense." 28 U.S.C. § 2254(e)(2)(B). Estrada has

19  attempted no such showings.

20         Estrada relies for his argument on Horton v. Mayle, 408 F.3d 570, 582 n.6 (9th Cir. 2005), a

21  case decided under pre-AEDPA law and distinguishable on the facts. (Traverse 33, ECF No. 95.) The

22  Horton court found an evidentiary hearing in federal court was warranted because material had been

23  concealed in violation of Brady v. Maryland, 373 U.S. 83 (1963), despite the petitioner's exercise of

24  "sufficient diligence in seeking to develop the factual basis of his claim in the state court proceedings."

25  Horton, 408 F.3d at 582 n.6. Due to the misconduct, his case "never reached the stage of the

26  proceedings at which an evidentiary hearing should be requested." Id. In contrast, Estrada's hearing

27  demand is governed by AEDPA, and he had ample opportunity to, and did, develop the facts in state

28  court. Estrada's reliance on Insyxiengmay, 403 F.3d 657 is also unavailing. (Traverse 34, ECF No.

95.) The Insyxiengmay court applied the approach from Baja, 187 F.3d at 1078 (9th Cir. 1999) that district courts are to follow post-AEDPA, predicated on Townsend v. Sain, 372 U.S. 293, 313 (1963), to facts readily distinguishable from Estrada's. That court determined the petitioner was entitled to an evidentiary hearing because he and his counsel had been excluded from an in camera proceeding, and that exclusion was the cause of the petitioner's inability to develop the factual record in state court to support his federal constitutional claims. Estrada satisfies none of the prerequisites to obtaining an evidentiary hearing in federal court. *See* 28 U.S.C. § 2254(e)(2).

Moreover, "a federal court may not grant an evidentiary hearing without first determining whether the state court's decision was an unreasonable determination of the facts." Earp v. Ornoski, 431 F.3d 1158, 1166-67 (9th Cir. 2005), *citing* Lockyer v. Andrade, 538 U.S. 63, 71 (2003); *see* Schriro, 550 U.S. at 474. "If a claim has been adjudicated on the merits by a state court," and "[i]f a claim subject to 28 U.S.C. § 2254(d)(1) does not satisfy that statutory requirement," it is "unnecessary to reach the question whether § 2254(e)(2) would permit a [federal] hearing on th[at] claim." Cullen, 131 S.Ct at 1400-01. A federal habeas petitioner "must overcome the limitation of § 2254(d)(1) on the record that was before that state court." Id. at 1400, n.7 ("[E]vidence introduced in federal court has no bearing on § 2254(d)(1) review" and an unreasonable determination of facts under § 2254(d)(2) must be found to be unreasonable "in light of the evidence presented in the State court proceeding"). Estrada's renewed request for an evidentiary hearing should be **DENIED**.

## C.   Ground One:  Racial Discrimination In Peremptory Challenges

"For more than a century, [the Supreme] Court consistently and repeatedly has reaffirmed that racial discrimination by the State in jury selection offends the Equal Protection Clause." Georgia v. McCollum, 505 U.S. 42, 44 (1992). Nevertheless, courts presume peremptory challenges are exercised in a constitutional manner, and the racial or ethnic or other shared characteristics of prospective jurors, standing alone, do not prevent their exclusion. *See* Batson v. Kentucky, 476 U.S. 79 (1986). The "Batson framework is designed to produce actual answers to suspicions and inferences that discrimination may have infected the jury selection process." Johnson v. California, 545 U.S. 162, 172 (2005), *citing* Batson, 476 U.S. at 97-98; *see* Snyder v. Louisiana, 552 U.S. 472 (2008).

/ / /

19

> *Batson* established the three-step inquiry used to determine whether this basic constitutional guarantee has been violated. First, the defendant must make a prima facie showing that the prosecution has exercised peremptory challenges in a racially discriminatory manner. *Batson*, 476 U.S. at 96. Such a showing may be made . . . where the prosecution has engaged in a pattern of strikes against jurors of a particular race. *Id.* at 97. Second, once the defendant has made a prima facie showing, "the burden shifts to the State to come forward with a neutral explanation for challenging" the jurors. *Id.* Third, the trial court must then determine whether, taking into consideration the prosecutor's explanations for his conduct, "the defendant has established purposeful discrimination." *Id.* at 98.

Ayala v. Wong, 730 F.3d at 838; *see also* Miller-El v. Dretke, 545 U.S. 231, 251-52 (2005).

"The first two <u>Batson</u> steps govern the production of evidence that allows the trial court to determine [at step three] the persuasiveness of the defendant's constitutional claim." <u>Johnson</u>, 545 U.S. at 171. "[T]he defendant must first show he is a member of a cognizable racial group, and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race." <u>Id.</u> at 169, *quoting* <u>Batson</u>, 476 U.S., at 96. "[A] *prima facie* case of discrimination can be made out by offering a wide variety of evidence, so long as the sum of the proffered facts gives 'rise to an inference of discriminatory purpose.' " <u>Id.</u>, *quoting* <u>Batson</u>, 476 U.S. at 94. The inquiry ends if the defendant fails to make a *prima facie* showing at step one. <u>Batson</u>, 476 U.S. at 96-97.

If a defendant satisfies the step one showing, the burden shifts to the prosecution to rebut the inference of bias by "com[ing] forward with a race-neutral explanation" for the strike. <u>Purkett v. Elem</u>, 514 U.S. 765, 767-68 (1995) (per curiam). The issue at step two is the facial validity of the prosecutor's explanation. <u>Id.</u>; *see* <u>Hernandez v. New York</u>, 500 U.S. 352, 363 (1991). As long as the reasons given are reasonably specific and neutral, even if they are trivial, unpersuasive, or implausible, they are not deemed invalid as long as they do not deny equal protection. <u>Puckett</u>, 514 at 769; *see* <u>Johnson</u>, 545 U.S. at 171. "It is not until the *third* step that the persuasiveness of the justification becomes relevant -- the step in which the trial court determines whether the opponent of the strike has carried his burden of proving purposeful discrimination." <u>Puckett</u>, 514 at 768; *see* <u>Johnson</u>, 545 U.S. at 170 (having "the benefit of all relevant circumstances, including the prosecutor's explanation," the trial judge decides "whether it was more likely than not that the challenge was improperly motivated").

A trial court's finding of no discriminatory intent is a factual determination accorded great deference by reviewing courts, especially since a finding on the issue " 'largely will turn on evaluation

1   of credibility.' " <u>Hernandez</u>, 500 U.S. at 364-65, *quoting* <u>Batson</u>, 476 U.S. at 98, n.21; *see* <u>Snyder</u>, 552

2   U.S. at 477 ("[T]he trial court must evaluate not only whether the prosecutor's demeanor belies a

3   discriminatory intent, but also whether the juror's demeanor can credibly be said to have exhibited the

4   basis for the strike attributed to the juror by the prosecutor").  A federal court may grant habeas relief

5   for trial court error in this regard only if the trial court was "unreasonable to credit the prosecutor's

6   race-neutral explanations for the <u>Batson</u> challenge."  <u>Rice v. Collins</u>, 546 U.S. 333, 338-39 (2006).

7          Estrada declares: : "I'm Mexican, Filipino, Italian and Spaniard." (Traverse 48, ECF No. 95.)

8   He alleges the prosecutor's use of four peremptory challenges, purportedly "to exclude Hispanics from

9   the jury," violated his Sixth and Fourteenth Amendment rights.  (FAP 7, 24, ECF No. 74.)  He

10  acknowledges that the four jurors at issue were "a diverse group," but argues that they all "shared"

11  Hispanic "ethnicity" such that "the totality of the circumstances known to the trial court supported an

12  inference of discriminatory intent, and the trial court's ruling [to the contrary] was not supported by

13  substantial evidence." (<u>Id.</u> at 35-36.)  Although he provides voir dire transcript excerpts in support of

14  this claim, (<u>id.</u> at 109-159), those excerpts demonstrate that the prosecutor's voir dire questions

15  targeted primarily the jurors' exposure to and views on drugs, guns, and gangs.

16          On direct appeal, the state court identified and applied the federal standard controlling this

17  issue from <u>Batson</u>, 476 U.S. 79, citing also on <u>People v. Wheeler</u>, 22 Cal.3d 258 (1978).[7]  "While

18  peremptory challenges are intended to allow parties to reject a certain number of jurors for any reason

19  at all, both the state and federal Constitutions prohibit the use of peremptory challenges to exclude

20  prospective jurors on the basis of race or ethnicity." (Lodg. No. 4, slip op. at 3-4.)  In its reasoned

21  decision, Estrada's court of appeal found no error and no ground for relief on this theory, and the

22  California Supreme Court did not disturb that result in summarily denying his Petition For Review.

23          Estrada's trial court had concluded at the first step of the <u>Batson</u> inquiry that he failed to make

24  a *prima facie* showing of discriminatory use of peremptory strikes, but nonetheless permitted

25  development of the record through the other steps.

26

27

28
    [7] The <u>Wheeler</u> standard was superseded by statute to conform to constitutional standards established
    by <u>Batson</u>. *See* <u>Wade v. Terhune</u>, 202 F.3d 1190, 1192 (9th Cir. 2000).

During jury selection, Estrada's counsel raised a *Wheeler/Batson* challenge to the prosecutor's use of peremptory strikes. At the time of the challenge, the prosecutor had exercised five peremptory strikes, seeking removal from the jury panel of Prospective Jurors Ayran, Barela, Oliverbarriga, Gonzalez, and Sanmiguel. Estrada's counsel argued that based on the strikes, it "looks like [the prosecutor] is excluding almost all racial category of [sic] Hispanics." The prosecutor disputed defense counsel's characterization of the races of the excluded jurors.

A wide-ranging discussion of the various ethnicities of the excluded jurors ensued. Judge Hernandez stated that Prospective Jurors Barela and Gonzalez appeared to be Hispanic; Prospective Juror Ayran had identified herself as Filipino; Prospective Juror Oliverbarriga was "possibly Hispanic"; and Prospective Juror Sanmiguel appeared to be "possibly Asian." (Sanmiguel later informed the court that she was not Hispanic, but from Guam.) The judge also noted that two of the jurors who had not been stricken (and were later empanel[]ed) appeared to be Hispanic, that the defense had excluded a Hispanic juror, and that other Hispanic jurors were still in the jury pool and could potentially be seated on the jury.

In light of the then-recent changes in the law regarding *Wheeler/Batson* challenges, the trial court also summarized the state of the law; specifically, the court noted the federal Supreme Court's 2005 decision in *Johnson, supra,* 545 U.S. 162, which the trial court (accurately) summarized as holding that "a defendant satisfies *Batson*'s first step requirement by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred." Given the *Johnson* standard, the trial court stated it could "not make a prima facie finding that . . . there is an inference of discrimination." Nevertheless, the court "invite[d]" the prosecutor to state the reasons for the challenges in order to "protect the record for appeal purposes."

The prosecutor provided his reasons for striking the five jurors. He stated that he had stricken Prospective Juror Barela because he was young and familiar with gangs; Prospective Juror Ayran because she worked at a state prison and had indicated reservations about voting to convict someone who could potentially become an inmate at the prison; Prospective Juror Oliverbarriga because she had strong ties to Mexico and could potentially be intimidated by Estrada's claimed connection to the "Mexican Mafia"; Prospective Juror Gonzalez because she lived in Logan Heights which was the area of the crime and related gang activity; and Prospective Juror Sanmiguel because her demeanor during voir dire indicated that she did not have the self confidence to be a "strong" juror. [FN: "The voir dire record reflects that during questioning Sanmiguel indicated that she didn't 'know anything' about guns, but later, after prompting, stated that she knew the difference between a revolver and a semiautomatic handgun."] Despite further argument from Estrada's counsel, the trial court did not alter its ruling that there had been no prima facie showing of discrimination and rejected the *Wheeler/Batson* challenge.

(Lodg. No. 4, slip op. at 4-6.)

Only the striking of Prospective Juror Gonzalez gave the court of appeal pause, because "both parties concede[] there is no record evidence associating Gonzalez with Logan Heights, an area that would play a significant part in the evidence presented at trial and in which there was high gang activity" and, consequently, "the prosecutor was either mistaken about Gonzalez or had information

22

1   regarding her residence that is not included in the appellate record." (Lodg. No. 4, slip op. at 10-11.)

2   Estrada exaggerates the potential import of that ambiguity when he argues that "[s]uch a significant

3   misstatement of the record raises serious questions about the prosecutor's motives for challenging Ms.

4   Gonzalez." (FAP 37, ECF No. 74 (citations omitted); *see also* Lodg. No. 4, slip op. at 11 fn. 7.) The

5   court of appeal reasonably concluded that it "was ill suited to determine whether the prosecutor's

6   reason" was "genuine (if mistaken) based solely on the paper record," and  deferred to the judgment

7   of the trial court. (Lodg. No. 4, slip op. at 11.) More fundamentally, the court also determined that,

8   in any event, it need not evaluate the prosecutor's reasons for strikes because that "is not the applicable

9   inquiry where, as here, the trial court found no prima facie case of discrimination" at <u>Batson</u>'s step one.

10   (<u>Id.</u> at 11, 12: "Given the 'totality of the relevant facts,' the trial court's finding of no prima facie case

11   is supported by substantial evidence and must be affirmed") (citation omitted).)

12        It is recommended the Court find the California Court of Appeal applied the correct legal

13   standard to reasonably conclude that "at most, the prosecutor had utilized four out of five strikes on

14   Hispanic-surnamed jurors" (Lodg. No. 4, slip op. at 6-8), a fact standing alone insufficient to support

15   a *prima facie* showing of discrimination and a result entitled to AEDPA deference. Estrada has

16   provided this Court with no basis for disturbing that result, foreclosing federal habeas relief. 28 U.S.C.

17   § 2254(d); *see* <u>Rice</u>, 546 U.S. at 338, 341-42.  Relief on Ground One should be **DENIED**.

18        **D.    Ground Two: Prosecutorial Delay**

19        Estrada complains about the delay between the dismissal of the 2002 assault case and the

20   subsequent reinstatement of those charges for trial in 2005 after his arrest for the Oceguera burglary

21   in 2004.  He characterizes the delayed trial on the assault charges as "unreasonable and unjustified"

22   in purported violation of his due process, equal protection, and Sixth Amendment rights "to a speedy

23   trial on the charges of 2002."  (FAP 8, 24, 41, ECF No. 74.)  The court of appeal summarized the

24   procedural history of the case before rejecting Estrada's arguments.

25        Estrada was arrested on the 2002 charges on November 16, 2002.  The
     prosecution dismissed the charges on February 10, 2003.  After the charges were

26   dismissed, Estrada, who was on parole at the time for a prior offense, had his parole
     revoked, and was returned to custody for 12 months.

27

28        The 2002 charges were refiled on July 26, 2004, approximately two months
     after Estrada was arrested for the Oceguera burglary. Trial was held on both sets of

charges (2002 and 2004) on April 6, 2005; after a hung jury, a second trial, which resulted in the instant convictions, commenced on August 24, 2005.

(Lodg. No. 4, slip op. at 13; *see also* id. at 14-15; FAP 41, ECF No. 74.)

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy . . . trial." U.S. Const. amend. VI. There is no fixed time period required to satisfy the Sixth Amendment. Barker v. Wingo, 407 U.S. 514, 530, 523 (1972) (adopting a balancing test, "in which the conduct of both the prosecution and the defendant are weighed"). However, no Sixth Amendment right to a speedy trial arises until charges are pending. Doggett v. United States, 505 U.S. 647, 651-52 (1992) (only when there is unexcused post-accusation delay is the speedy trial right implicated, a violation of which is determined by balancing the Barker factors: (1) the length of delay; (2) the reason for the delay; (3) the defendant's assertion of his right; and (4) prejudice to the defendant). Id. Estrada has no Sixth Amendment claim on these facts.

Nevertheless, in some circumstances delay prior to arrest or indictment may give rise to a due process claim under the Fifth Amendment. *See* United States v. Lovasco, 431 U.S. 783. 788-790 (1977), *citing* United States v. Marion, 404 U.S. 307, 320-21 (1971) (declining to extend the reach of the Speedy Trial Clause of the Sixth Amendment to the period before a defendant is indicted, arrested, or otherwise officially accused). Estrada's court of appeal accurately distinguished the right to due process from the right to a speedy trial, while acknowledging their analytical similarities.

> Because the delay about which Estrada complains occurred after the prosecution had dismissed the 2002 case, and prior to his being formally charged or arrested for purposes of the subsequent trial, Estrada's challenge "must be scrutinized under the Due Process Clause, not the Speedy Trial Clause." (*United States v. MacDonald* (1982) 456 U.S. 1, 7 ["the Speedy Trial Clause has no application after the Government, acting in good faith, formally drops charges. Any undue delay after charges are dismissed, like any delay before charges are filed, must be scrutinized under the Due Process Clause, not the Speedy Trial Clause"] *People v. Butler* (1995) 36 Cal.App.4th 455, 466 [recognizing that "California also recognizes the distinction between pre- and post-accusation delay" and noting that the state constitutional provision, which "attaches when the criminal complaint is filed," is "based on principles of due process and the right to a fair trial"].) . . . . Nevertheless, "the test is the same, i.e., any prejudice to the defendant resulting from the delay must be weighed against the justification for that delay." [Citations omitted.]

(Lodg. No. 4, slip op. at 15-16.)

Estrada relies for this claim primarily on the prejudice he alleges in the form of witnesses' faded memories, the loss of the 911 tape recording of the assault report, and the intervening death of a

24

witness.  *See* <u>Lovasco</u>, 431 U.S. at 788-790 (noting that "proof of prejudice is generally a necessary but not sufficient element of a due process claim, and that the due process inquiry must consider the reasons for the delay as well as the prejudice to the accused").  He argues:

> By the time Estrada was brought to trial on the 2002 charges, evidence and witnesses which would have been helpful to his defense were no longer available to him.  Estrada's principal defense to the 2002 assault charges was self-defense.  Evidence of Silva's aggressive or violent tendencies would have been admissible in support of that defense.  Mark Perez, who would have testified to assaultive behavior and firearm use by Silva, died in May 2003 and was unavailable to testify at the trials in 2005.  The testimony of Perez would have allowed the jury to assess the inconsistent testimony of Sanchez and Anzar in light of Silva's violent tendencies and tipped the balance in favor of Estrada's testimony he acted in self-defense.  The loss of Perez's testimony during the delay between the dismissal and re-filing of charges impaired Estrada's ability to present his primary defense to the 2002 charges and was therefore prejudicial.

(FAP 41-42, ECF No. 74 (citations to the trial record and to California law omitted).)

Respondent highlights a countervailing fact and inference that Estrada does not rebut:

> Estrada testified that when Silva assaulted him the day before he was arrested [in 2002], he was with Mark Perez and his friend "Dax."  (21 RT 4503.)  While Estrada asserts that Perez died prior to his trial, he fails to show any prejudice by the absence of this testimony because, in all likelihood, Dax could have testified regarding this alleged incident.

(Ans. 37, ECF No. 78-1.)

Estrada insists that the reasons the prosecution offered to explain the dismissal of the charges in February 2003 (i.e., "witnesses' failure to cooperate and to appear for the preliminary hearing") does not excuse its purported failure to "make efforts to bring the witnesses to court."  (FAP 44, ECF 74.)  However, Estrada does not support his inferences of bad faith manipulation of the timing of the prosecution on the assault charges to gain a strategic advantage.

> The reasonable inference is that the prosecution made a conscious decision to drop the prosecution of Estrada on the 2002 charges and allow them to be handled as a parole revocation matter.  The interest in prosecuting Estrada was only revived belatedly, after his arrest on additional charges in 2004, when the prosecution seized the opportunity to pile on additional charges by refiling the 2002 charges.

(FAP 44-45, ECF 74.)

Moreover, when considered in the context of all the trial evidence, Estrada overstates the significance of any favorable contribution to the defense from the particular unavailable witnesses he identifies when he asserts their purported testimony would have "tip[ped] the balance" in favor of his

1   self-defense theory. (FAP 41-42, ECF No. 74.) The proffered (but unsubstantiated) content of their

2   testimony was limited to impeachment on the tangential issue of Silva's aggressiveness and knowledge

3   of firearms. The percipient witnesses to the assault, including Silva, all testified at Estrada's trials, and

4   the jury had the opportunity to evaluate their credibility. His attempted prejudice demonstration thus

5   relies on tenuous and speculative inferences immaterial to any element of the charged crimes. It

6   particularly falls short "in light of the overwhelming evidence Estrada committed the instant crimes."

7   (Ans. 37, ECF No. 78-1.)

8           At trial, Silva testified about the beating he incurred at the hands of Estrada after which
            he needed four or five stitches to close a head wound. (6 RT 864-66.) Chrispina
9           Sanchez dialed 911 following the incident and subsequently identified Estrada from a
            photo lineup. (6 RT 846-47, 897.) Moreover, Officer Mark Chavez of the San Diego
10          Police department testified regarding his interview with both Sanchez and Silva, who
            both described Estrada as the aggressor in the assault. (6 RT 829-31, 846-47, 939-40.)
11          Had Pacheko or Sanchez [sic] testified that Silva had been violent in the past, it is
            highly doubtful it would have had any impact on the jury's decision . . . .
12
13   (Ans. 37, ECF No. 78-1.)

14          The court of appeal examined the justification for the delay in prosecuting the 2002 charges

15   in consideration of Estrada's arguments before concluding that he was attempting "simply to relitigate

16   the factual disputes that have been resolved adversely to him in the trial court." (Lodg. No. 4, slip op.

17   at 16-17).

18          . . . Estrada was not significantly prejudiced by the delay. The [trial] court stated, "the
            People dismissed the initial case in good faith" based on the "evidence that the
19          [witnesses] involved here were Mr. Estrada's friends" and "were reluctant to appear."
            The trial court also found that Estrada "has not shown prejudice" because he "admitted
20          a parole violation irrespective of the underlying charges in this case" and so had "not
            shown that he served additional time for a parole violation based simply upon this
21          case"; the evidence Estrada claimed had been lost during the delay in bringing his case
            to trial, the court found, was "not relevant to the defendant's guilt"; and its absence at
22          trial "does not appear to have harmed defendant's case in any way." The trial judge,
            who had presided over two trials of the case, and the evidentiary hearing addressing
23          this very issue was well positioned to make these determinations. . . . [¶] Estrada's
            contrary contentions on appeal, which constitute an effort to simply relitigate the
24          factual disputes that have been resolved adversely to him in the trial court, without
            reference to the applicable standard of review [that appellate courts will not reweigh
25          evidence when substantial evidence supports the trial court's findings], are
            unpersuasive.

26   (Lodg. No. 4, slip op. at 16-17.) Similarly here, Estrada ignores the AEDPA standards of review

27   applicable to his federal petition and attempts instead to relitigate the factual disputes resolved

28   adversely to him in the state courts.

Estrada's additional argument that the outcome of his trial was significantly prejudiced by the unavailability at trial of the actual 911 tape recording of Chrispina Sanchez's call reporting the 2002 assault is meritless. The police dispatcher who took that call, Nicole Wallace, testified at Estrada's trial. She explained that tape recordings of that nature are not kept long, but a Computer Aided Dispatch ("CAD") record of those calls is retained. (RT vol. 9 of 23 at 842-844.) She read the text of the CAD record of Sanchez's 911 call word for word into the trial record. The record memorialized that Chrispina stated that "a friend of her brother came to her house, pulled out a gun, and had hit a male." (Id. at 847-850.) As Respondent observes, "because of the existence of the CAD and the ability to cross-examine Wallace regarding the 911 call, Estrada's defense was not hindered." (Ans. 37-38, ECF No. 78-1 Estrada's dubious contention that the actual tape recording might have "indicat[ed] whether Sanchez was under the influence of drugs at the time of the call, which was relevant to the credibility of her testimony and her statements to police," (FAP 43, ECF No. 74), would have added nothing to the factual context of the trial evidence.

> The record is clear, however, that Sanchez was, in fact, doing methamphetamine that night – a fact the jury was well aware of. (6 RT 758, 763, 802, 856.) There is no reason to believe the preservation of the tape would have assisted the defense and therefore, Estrada failed to show he was prejudiced by the destruction of the 911 tape.

(Ans. 38, ECF No. 78-1; *see, e.g.,* RT vol. 9 of 23 at 795-796, 800-802: Sanchez testified that she used several drugs including methamphetamine and heroin, including at the time of and for several days before the 2002 incident.)

Furthermore, the record suggests that Estrada bears responsibility for a number of the trial delays after his May 2004 arrest for the Oceguera residential burglary and the July 26, 2004 arraignment on the amended complaint in that case when the 2002 assault charges were reinstated. He also made multiple requests for continuances and substitution of counsel and obtained a period of self-representation, among other things, before and after his first trial. (*See, e.g.*, Lodg. No. 16, CT vol. 3 at 511-568, 596-597.) Finally, Estrada adds:

> In addition to the prejudice resulting from unavailable witnesses and evidence, the delay in prosecuting the 2002 charges allowed the prosecution to try Estrada jointly on the 2002 and 2004 charges. If Estrada had been promptly brought to trial on the 2002 charges, the jury would not have been exposed to prejudicial and largely irrelevant evidence which the jury in the joint trial was allowed to hear, including evidence of the alleged burglary of the Oceguera residence; Oceguera's testimony about

Estrada's alleged assault on him, which the jurors likely viewed as evidence of a propensity to engage in assaultive conduct, leading them to infer Estrada committed the alleged assault on Silva; and evidence of Estrada's alleged association with the "Mexican Mafia."

(FAP 43, ECF No. 74.)

The discrete components of Estrada's evidentiary challenges are addressed below in connection with his Ground Four claims. His arguments in support of his improper joinder claim are addressed in connection with Ground Three, below.

According the requisite deference to the state court result on this claim, it is recommended the Court find the state court reached an objectively reasonable result from the record that is not contrary to nor an unreasonable application of United States Supreme Court authority controlling the due process analysis in this context. 28 U.S.C. § 2254(d). As Estrada satisfies neither exception to the AEDPA deference federal habeas courts owe to the state court resolution of this issue, 28 U.S.C. § 2254(d), relief on Ground Two should be **DENIED**.

**E.     Ground Three:  Improper Joinder Of Offenses For Trial**

Estrada sweepingly represents that the prosecutor joined the assault charges from November 2002 and the burglary charges from May 2004 for improper motives calculated to prejudice his trial results. He argues the trial court violated his constitutional rights when it denied on two occasions his motions to sever the trials.

"Improper joinder does not, in itself, violate the Constitution.  Misjoinder rises to the level of a constitutional violation only if it results in prejudice so great as to deny a defendant his Fifth Amendment right to a fair trial." United States v. Lane, 474 U.S. 438, 446 n. 8 (1986). A defendant's burden to establish a due process violation in this regard requires that he demonstrate that actual, and not just potential, prejudice resulted as the events unfolded during the trial. *See* Opper v. United States, 348 U.S. 84, 94-95 (1954); *see also* Sandoval v. Calderon, 241 F.3d 765, 772 (2000) (recognizing a "particularly great" risk of prejudice whenever joinder: (1) "allows evidence of other crimes to be introduced in a trial where the evidence would otherwise be inadmissible," or (2) results in "joinder of a strong evidentiary case with a weaker one").

///

1    In denying the first severance motion at the time of his first trial, the trial court rejected

2 Estrada's arguments that the offenses were not joinable under California's joinder statute, and that

3 evidence from the 2002 incident would be "inflammatory" to the 2004 case. Applying state law. the

4 court found "both series of crimes were of the same class in that they both involved assaultive

5 conduct," Estrada would not be prejudiced by the joinder "because both cases were equally strong,"

6 the prosecution was not "bootstrapping a weak case on the back of a strong case," and the jury would

7 receive CALJIC No. 17.02, instructing that each charged count must be decided separately. (RT vol.

8 5 of 23 at 154-155.) In denying Estrada's second motion to sever brought by new counsel prior to his

9 retrial, the court again found that the cases were of the same class of crimes, there was

10 cross-admissibility "regarding at least motive," and that this was not a situation in which the

11 prosecution was using one case to "bolster" a weaker case. (RT vol. 8 of 23 at 541.)

12    The court of appeal conducted a thorough analysis of this claim before rejecting it on the merits

13 as a matter of settled state law embodied in the joinder statute and long upheld by the California courts.

14 (Lodg. No. 4, slip op. at 18-20.) "Whether offenses properly are joined pursuant to [Cal. Penal Code]

15 section 954 is a question of law and . . . the decision whether separate proceedings are required in the

16 interest of justice is reviewed for an abuse of discretion," and "[t]he prejudice, if any, that resulted

17 from joinder of the two cases is not such that would support a claim on appeal that the trial court

18 abused its discretion." (Id. at 18-19 (citations omitted); see also id. at 20 n.10.)   In his Petition,

19 Estrada summarily disputes the state courts' findings on this state law issue, arguing: "the charges did

20 not involve offenses of the same class [citing Cal. Penal Code §945 ], and joinder of these charges was

21 prejudicial to Estrada." (FAP 45, 24, ECF No. 74; see also id. at 48.)  State court interpretations of

22 state law "bind a federal court sitting in habeas corpus." Bradshaw, 546 U.S. at 76.  This claim is not

23 cognizable on federal habeas review.

24    Estrada purports to add here a claim that the joinder violated his federal due process, equal

25 protection, and Sixth Amendment rights: "[m]isjoinder of counts requires reversal if it substantially

26 prejudices the defendant's right to a fair trial." (FAP 48, ECF No. 74, citing Lane, 474 U.S. at 449.)

27

28    Evidence of the joined charges would not have been admissible in separate trials.  The
alleged assaults in 2002 and the alleged burglary in 2004 were dissimilar in their

29

elements and their commission.  Neither would have been admissible for the purpose of showing similar intent, or a common plan or design, and identity was not an issue. [Citation.]  Moreover, as discussed in [Ground Four], joinder also resulted in the jurors' hearing irrelevant but highly prejudicial evidence of other uncharged acts, which would not have occurred in a separate trial of the 2002 charges.  Misjoinder of the cases thus resulted in the jurors' exposure to evidence of other crimes, both charged and uncharged, allegedly committed by Estrada.  Such evidence was inherently prejudicial and created a risk the jury would base its verdict on an impermissible inference of a criminal disposition.  The prejudicial effect of such evidence was compounded by the absence of a limiting instruction regarding the permissible use of such evidence.

(FAP 49, ECF No. 74.)

Estrada's reliance on Lane is misplaced.  The Lane Court was deciding misjoinder challenges on direct review of a federal conviction, applying federal criminal rules of procedure.  Estrada's elaboration of the alleged prejudice from the joinder in his case rests upon speculation and evidentiary objections derived from his interpretation of state law, a concern immaterial to a federal habeas court's review of a state court conviction, rather than a demonstration of resulting fundamental unfairness in the outcome of his trial.

Even were this claim exhausted as a federal claim and cognizable here, the absence of cross-admissibility of evidence does not by itself demonstrate prejudice, particularly where, as here, the verdicts show the jurors were manifestly able to compartmentalize the evidence.  *See, e.g.,* Featherstone v. Estelle, 948 F.2d 1497, 1503 (9th Cir. 1991) (reviewing a Cal. Penal Code § 954 claim and stating that consolidation rests in the sound discretion of the state trial judge; without a showing that the simultaneous trial of multiple offenses actually rendered the state trial fundamentally unfair, and therefore violative of due process, federal relief is not available on a misjoinder claim); *see also* Park, 202 F.3d at 1150 (finding no constitutional error in the joinder of counts that were not cross-admissible); Sandoval, 241 F.3d at 772 (reversing a grant of habeas relief because there was no harmful and injurious effect from the denial of severance).

In consideration of the entire trial record, it is recommended the Court find that Estrada has not carried his burden to demonstrate his trial was rendered fundamentally unfair by the joinder of charges from Estrada's assault case and his burglary case.  At a minimum, fairminded jurists could disagree whether the review standard is satisfied on this record.  *See* Richter, 131 S.Ct. at 786; Sandoval, 241 F.3d at 772; 28 U.S.C. § 2254(d).  The state court's conclusion that the denial of severance did not

1   injuriously affect the verdicts is based on a reasonable determination of the facts from the record and

2   is entitled to deference. Accordingly, relief on Ground Three should be **DENIED**.

3       **F.   Ground Four: Improper Admission Of Evidence**

4           Estrada sweepingly alleges his due process, equal protection, and fair trial rights were violated

5   by the prejudicial admission of particular evidence at trial. (FAP 10, ECF No. 74.) Although these

6   arguments overlap with his Ground Three "misjoinder" argument, Estrada frames three discrete

7   instances of purported evidentiary error in his FAP Ground Four, as he had on direct review in the

8   court of appeal: "Specifically, Estrada argues the trial court abused its discretion by permitting

9   evidence of: (i) [a prior and uncharged] assault by Estrada on Javier [Oceguera]; (ii) the circumstances

10  of Estrada's arrest in May 2004; and (iii) Estrada's housing in administrative segregation with a

11  Mexican Mafia 'associate,' Miguel Thomson." (Lodg. No. 4, slip op. at 20-21; *see* FAP 50, ECF No.

12  74.) With respect to the first two evidentiary issues, he argues that "evidence of the alleged assault on

13  Oceguera and the alleged burglary of his aunt's home created a substantial risk the jurors would

14  conclude Estrada was an habitual criminal and convict him based on criminal propensity." (FAP 57,

15  ECF No. 74 (citations omitted).) Estrada argues that all that evidence "was inadmissible under

16  Evidence Code Sections <u>1101</u> and <u>352</u>," was "both irrelevant and unduly prejudicial" under those code

17  sections, and was improperly offered and admitted "to prove that petitioner had a criminal disposition

18  or a propensity to have committed the charge crimes." (<u>Id.</u> at 24, 50, 75 (emphasis in original).)

19  However, he concedes, again relying on state law rules, that such evidence is admissible "when it is

20  relevant to prove or disprove some material fact other than a character trait or the propensity to commit

21  criminal acts." (<u>Id.</u> at 75 (citations omitted).)

22          The court of appeal separately resolved each of those issues on the merits, finding that even

23  if the evidence was erroneously admitted, Estrada established no grounds for reversal. The court relied

24  solely on the Cal. Evid. Code sections addressing the determination and admissibility of relevant

25  evidence (Cal. Evid. Code §§ 210, 350, 352) and the admissibility or inadmissibility of evidence of

26  a person's character or trait of character depending on the proffered use of such evidence (Cal. Evid.

27  Code § 1101). (Lodg. No. 4, slip op. at 21-27.) The court determined that each challenged item of

28  evidence was relevant to various issues at trial, its admission was not so prejudicial that exclusion was

1  mandated under Evidence Code section 352, and therefore, in none of those particulars, did the trial

2  court abuse its discretion.

3       State and federal trial courts have broad latitude accorded by the Constitution to establish

4  evidentiary rules governing the admission or exclusion of evidence.  United States v. Scheffer, 523

5  U.S. 303, 308 (1998).  State law evidentiary rulings ordinarily do not present a question cognizable

6  on federal habeas review. *See, e.g.,* Estelle, 502 U.S. at 67-68;  Larson v. Palmateer, 515 F.3d 1057,

7  1065 (9th Cir. 2008)  ("The correctness of the trial court's evidentiary ruling as a matter of state law

8  is irrelevant to" federal habeas review:  the only question "is whether the ruling rendered the trial so

9  fundamentally unfair as to violate due process"); *see also* Windham v. Merkle, 163 F.3d 1092, 1103

10  (9th Cir. 1998).  Reviewing federal courts will not find a constitutional violation as long as the

11  evidence is relevant to an issue in the case and a permissible inference can be drawn from it.  Estelle,

12  502 U.S. at 70; *see* Jammal v. Van de Kamp, 926 F.2d 918, 920 (9th Cir. 1991) ("Only if there are *no*

13  permissible inferences the jury may draw from the evidence can its admission violate due process").

14  "[W]e must rely on the jury to sort out [inferences] in light of the court's instructions." Id.; *see also*

15  Williams v. Stewart, 441 F.3d 1030, 1040 (9th Cir. 2006) (same).

16         **1.**    **Prior Assault On Javier Oceguera**

17       As pertinent here, Mr. Oceguera testified that a couple of years before the 2004 burglary,

18  Estrada had beaten him up in his garage.  He had gone to retrieve an extension cord and was surprised

19  to find Estrada there.  He asked Estrada to leave because it was late and he did not want him there.

20  When he turned his back thinking Estrada had left, Estrada came from behind and began choking,

21  hitting, and kicking him.  (RT vol. 11 of 23 at 1318-1320.)  Mr. Oceguera testified that Estrada then

22  pulled a semiautomatic gun on him.  He was sure the gun was real, "especially when he pulled the

23  slide." (Id. at 1321, 1322.)  Estrada told Oceguera he could shoot him because he "was a street killer"

24  and "a hit man" for the "Mexican Mafia."  (Id. at 1323.)  He left Oceguera bleeding and scared.

25  Oceguera testified that he remembered that incident on May 29, 2004 when his wife found Estrada in

26  his garage again.  Estrada told him "if I ever call the cops, he was going to kill my family, me and my

27  family." (Id. at 1324.)  The trial court overruled defense counsel's irrelevancy objection.  The court

28  of appeal found no abuse of discretion.

The evidence of the assault was relevant to various issues at trial. (See Evid. Code, § 210 [relevant evidence is evidence that has "any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action"]) The evidence rebutted the suggestion that Estrada entered the Ocegueras' garage in 2004 with innocent intent, suggested that Estrada possessed a semiautomatic firearm like the one utilized in the 2002 assault, and served to explain Javier's fear of Estrada and apparent reluctance to report the 2002 [sic] incident to police. [FN 11: ". . . . Javier testified that he was 'scared' of Estrada 'because of what he told me when he went to my house and beat me up and he was going to kill everybody,' and stated that this influenced his behavior during the 2002 [sic] incident, his decision to call police, and his testimony at the preliminary hearing. While Javier emphasized that he 'did not want to call the police because I was scared,' defense counsel, on cross-examination, suggested that Javier's reluctance to call the police stemmed from the fact that he was a drug dealer."]  Given the relevance of the evidence on these points it was not rendered inadmissible by Evidence Code section 1101. (*Id.*, subd. (b) [evidence that a defendant has committed uncharged crimes is admissible "when relevant to prove some fact . . . other than his or her disposition to commit such an act"].)

(Lodg. No. 4, slip op. at 22-23, finding "the evidence had significant probative value, and the trial court acted within its discretion in concluding that this probative value was not 'substantially outweighed' by the danger of undue prejudice").)

It is recommended that the Court find no due process violation occurred associated with the admission of the prior assault evidence. The state court result was based on a reasonable determination of the facts from the record and comports with controlling United States Supreme Court authority. 28 U.S.C. § 2254(d); *see* Estelle, 502 U.S. at 70; *see also* Jammal, 926 F.2d at 920.

## 2.    Circumstances Of Estrada's Arrest

Estrada challenges the admission of evidence regarding his arrest at his aunt Elizabeth Duran's house the day after the Oceguera burglary in circumstances from which a reasonable inference could be drawn that he was also burglarizing his aunt's house. He argues the "evidence of [his] 2004 arrest at his aunt's house . . . should not have been admitted because it 'surely confused and distracted the jurors.' " (FAP 25, ECF No. 74.) Estrada had explained his presence at the Oceguera property and at his aunt's house during his testimony at his first trial, read into the record at his second trial. (*See* RT vol. 12 of 23 at 1687-1696.) The court of appeal summarized:

In the transcript, Estrada's explained that on the night of the Oceguera burglary he had gone to the Oceguera residence to obtain drugs. As he arrived, he saw an associate, Miguel Thomson, leaving. Estrada then spoke with Javier in the garage, and Javier told him to wait until he returned. Javier did not return that night, however, and Estrada fell asleep in the garage. In the morning, Estrada said that Maria came into the garage and, upon seeing him, yelled to her husband to call the police. Maria then left, and Estrada and Javier spoke for a while until Estrada left, returning to his aunt's house.

Estrada stated that he had been staying at his aunt's house off and on, including on the day of his arrest (May 30, 2004) while his aunt was on vacation. Estrada acknowledged that he had not been given explicit permission to stay there while his aunt was away, but stated his mother had given him permission and the keys to the house, and asked him to keep an eye on it. Estrada stayed at the house with an acquaintance named Buchanan and had a party while he was there. After the Oceguera burglary, Estrada was arrested at his aunt's home; during the arrest, police noticed that the frame to one of the bedroom doors inside Estrada's aunt's house had been damaged. Officers also observed jewelry on the floor outside the broken door, but left it where it lay.

(Lodg. No. 4, slip op. at 23-24.)

Estrada's mother testified consistently with Estrada's statement that she gave him the keys to her sister Elizabeth's house on May 28 or May 29, 2004 while Elizabeth was out of town. (RT vol. 13 of 23 at 1928-1948.) She stated that Estrada asked her for the keys so he could pick up some of his clothes and "just kick back there." (Id. at 1940-1941.)

Marco Duran, Elizabeth's brother and Estrada's uncle, testified that Elizabeth had asked him to watch the house while she was away with family over the Memorial Day weekend and told him no one should be there. (RT vol. 13 of 23 at 1952-1958.) When he drove by the house on May 30, 2004, Duran saw Estrada outside the house and called police. (Id. at 1953-1954.) Police officer Thomas Sullivan and another officer responded to that call. Officer Sullivan testified they knocked on the door and found Estrada and another man inside. (Id. at 1960-1961.) While inside, the officer noticed damage to an upstairs bedroom door from being forced open, and he authenticated at trial a photograph he took of the door at the time. (Id. at 1962-1964.) As an offer of proof at sidebar, the prosecution represented that Estrada had testified at his first trial that there were no broken doors in the house, (id. at 1962-1963), although Estrada disputes that representation. The photograph was admitted as the People's Exhibit 18. While he was inside the house, Officer Sullivan spoke with Elizabeth Duran by phone, specifically asking her, among other things, whether Estrada was supposed to be there. As a result of that conversation, he arrested Estrada. (Id. at 1961-1962.) His report records that the "primary charge was violation of parole, burglary and trespassing." ( Id. at 1974-1975.) He testified he also relied on information he had received from another officer "at lineup the previous day" associated with the Oceguera burglary report. (Id. at 1973-1974.) At trial, Estrada's aunt testified that after Estrada's stay at her house, nothing was missing.

1    Defense counsel objected on relevance grounds to admitting evidence regarding the

2    circumstances of Estrada's arrest.   The prosecutor proffered that the evidence "goes to intent, what he

3    was doing that day. . . ."  (RT vol. 13 of 23 at 1967-68; *see also* RT vol. 16 of 23 at 2636-2639.)[8]

> 4    Judge, it's our position on this case that Mr. Estrada did not have permission to be in
>      the house, that he was in fact stealing.  The door was broken in . . . ; as he indicated,
> 5    the day that they left, they had a party there, a bunch of people were there.  He says the
>      door was not broke, but the door was broke.  We have a pile of jewelry stacked up
> 6    there.  We have Buchanan there.  Buchanan was staying there, according to Estrada . . .
>      [and] its our position that the aunt's house, he didn't have permission to be there and
> 7    that Mom is coming in and protecting him by saying that he did have permission, all
>      of which is inconsistent with his . . . prior statements at the other trial, which goes to
> 8    impeach him . . . as to what is going on.

9    (RT vol. 13 of 23 at 1965-1966.)

10    The trial court overruled the defense objections.  (RT vol. 13 of 23 at 1967.)  The court of

11   appeal reasonably concluded that although the arrest evidence had minimal relevance, it "also had little

12   prejudicial effect and consequently cannot support a claim for reversal on appeal."  (Lodg. No. 4, slip

13   op. at 25.)  The court found the circumstances of Estrada's 2004 arrest had at least minimal relevance

14   to issues in the case, and permissible inferences could be drawn from them, all that is required to avoid

15   a federal constitutional concern in this context.  *See* Estelle, 502 U.S. at 70; Jammal, 926 F.2d at 920;

16   Williams, 441 F.3d at 1040.  The state court result on this issue does not warrant federal habeas relief.

17   ### 3.   **The Oceguera "Script"**

18    Relying solely on Cal. Evid. Code §§ 1101 and 352 and state caselaw, Estrada argues that

19   People's Exhibit 12, a document he prepared describing his version of the Oceguera garage incident

20   found among Miguel Thompson's papers while they were sharing a jail cell, should not have been

21   admitted at trial.  He argues it had no probative value and, among other things, by association with the

22   circumstances of its discovery impermissibly suggested that Estrada had gang affiliations or was

23   otherwise a dangerous person.[9]  (FAP 52-56, ECF No. 74.)

24   _____

25    [8] Other trial evidence established that at the time of his arrest, Estrada was working part time for room
     and board, he was not being paid, and he had a drug problem, permitting inferences that he had no regular place
26   to stay and had financial problems that could provide a motive to steal.  (*See* RT vol. 16 of 23 at 2636-2639.)

27    [9] Deputy Christopher Dacar testified at the 402 hearing and at trial that he had information Miguel
     Thompson was placed in administrative segregation due to his association with "EME" (the Mexican Mafia),
28   but that he had no information Estrada had any gang association.  (RT vol. 13 of 23 at 1767-1768, 1769.)

1    Defense counsel received a requested Cal. Evid. Code § 402 hearing ("402 hearing")[10] on the

2    admissibility of three documents offered as prosecution exhibits, including the Oceguera "script,"

3    found during a February 2005 search of Miguel Thompson's non-legal mail in the Vista jail cell that

4    he and Estrada were sharing in the jail's administrative segregation housing.   (RT vol. 12 of 23 at

5    1666-1667, RT vol. 13 of 23 at 1755-1758, 1771-1793.)   Deputy Christopher Dacar had conducted

6    the mail search.  (RT vol. 13 of 23 at 1758-1759.)  He testified that he copied about 300 items of

7    Thompson's property and authenticated as items he found during that search the three challenged

8    exhibits:  an envelope addressed to Miguel Thompson bearing the notations "Joey's" and "Oceguera"

9    (Peoples Exhibit 10); three pages of Officer Morrison's report on the Oceguera burglary (People's

10   Exhibit 11); and "an additional hand-printed two-page document . . . . labeled 'The Script, Oceguera'

11   on the top page" (People's Exhibit 12).  (Id. at 1759-1762.)  Deputy Dacar ultimately testified at trial

12   consistently with his testimony at the 402 hearing.  (Id. at 1844-1853, 1857, 1859-1860.)

13   The prosecutor argued at the hearing that the Oceguera incident "script" supported inferences

14   of story fabrication that he intended to argue to the jury, when considered in connection with portions

15   of Estrada's testimony at his first trial.  (RT vol. 12 of 23 at 1669.)  For the first time during his trial

16   testimony, Estrada had stated that he saw Miguel Thompson leaving the Oceguera property as he was

17   arriving the night of the burglary and that they briefly spoke at the yard gate.  (Id. at 1689-1690; see

18   also RT vol. 13 of 23 at 1753.) That evidence could "show that there was collusion and that this script

19   was prepared for Thompson to testify," and that "Thompson had [the script] in an envelope addressed

20   to Thompson with the term Joey and Oceguera and other information on the outside of the envelope,"

21   and that Estrada "gave it to him." (RT vol. 12 of 23 at 1667-1669, 1672.)

22   Estrada also testified at the 402 hearing.  He authenticated his handwriting on the envelope

23   exhibit, but denied ever giving the contents to Thompson.  (RT vol. 13 of 23 at 1781.) He testified that

24   when he returned to the shared cell after the search, he noticed "they took my script from me."  (Id. at

25   1777-1779.)  He explained he did not include Thompson's name in the script because he did not want

26

---

27   [10]   Hearings to determine the "existence or nonexistence" of a disputed "preliminary fact" are
controlled by Cal. Evid. Code section 402. West's Ann.Cal.Evid.Code § 402 (West 2011) ("(c) A ruling on the

28   admissibility of evidence implies whatever finding of fact is prerequisite thereto . . . .").

1  Thompson, a convicted felon, involved in his case. (Id. at 1783-1784.) He represented that he wrote

2  the script for his preliminary hearing attorney, Albert Bradley, as his best recollection of the May 29,

3  2004 events. (Id. at 1779-1783.) Although defense counsel argued that the script was attorney/client

4  privileged information and work product intended to be used for trial preparation (id. at 1793), Mr.

5  Bradley testified at the hearing that although he recalled having seen the envelope and the officer's

6  report exhibits, he was fairly confident he had not previously seen Estrada's hand written "script". (Id.

7  at 1772-1776). At the conclusion of the 402 hearing, the court ruled that the envelope and its contents,

8  including the script, were relevant and admissible evidence. (Id. at 1793.) The court of appeal

9  summarized that evidence and its use at trial:

10      In February 2005, Estrada shared a cell in the Vista detention facility with
        Miguel Thomson. A sheriff's deputy assigned to the facility testified that during that
11      approximate time frame he searched Thomson's cell. Among Thomson's belongings,
        the deputy found an envelope addressed to Thomson (trial exhibit 10) containing a
12      police report regarding the Oceguera burglary (trial exhibit 11) and a two-page
        handwritten document, titled "The Script Oceguera" (trial exhibit 12). The documents
13      were admitted into evidence. . . . At the conclusion of the trial, the prosecutor argued
        in closing that Estrada exhibited a consciousness of guilt by fabricating a story
14      involving Thomson and attempting to brief him on the story by providing documents
        regarding the incident.

15
16  (Lodg. No. 4, slip op. at 25-26.)

17      The court of appeal found that the evidence of Thompson's possession of police reports

18  regarding the Oceguera burglary and Estrada's "script" had "plainly probative value," the circumstances

19  of its discovery had to be established at trial, and concluded that "the record does not support the

20  conclusion that the trial court abused its discretion in failing to determine that the potential prejudice

21  substantially outweighed the probative value." (Lodg. No. 4, slip op. at 26-27, citing Cal. Evid. Code

22  § 352 (emphasis in original).) The court characterized Deputy Dacor's testimony about Thompson's

23  EME "associate" status as "irrelevant testimony on collateral matters" for the same contextual fact

24  development reasons supporting permissible inferences. (Id. at 26 n. 12, 27 n. 13.) The court of

25  appeal also rejected Estrada's argument that the allusion to Thompson's reputed association with the

26  Mexican Mafia created a prejudicial reflection on himself and should have been excluded under Cal.

27  Evid. Code § 352 on grounds its probative value was substantially outweighed by its prejudicial effect.

28  (FAP 56, ECF No. 74.) The court explained:

                                    37                                 10cv2014-DMS(KSC)

1   . . . Admission of that evidence further necessitated some discussion of Estrada's
2   relationship to Thomson − being housed together in jail − and their ability to
    communicate with each other. Combined with Estrada's testimony at his initial trial
    (which was introduced in the second trial) that he encountered Thomson leaving the
3   Oceguera' home at the time of the burglary, this evidence, in toto, supported an
    inference that Estrada attempted to fabricate an exculpatory scenario for his presence
4   at the Oceguera' home the night of the burglary, exhibiting consciousness of guilt.

5   (Lodg No. 4, slip op. at 26-27.)

6       Estrada's repackaging of his challenge to the admission of the "Oceguera script" exhibit as an

7   instance of prosecutorial misconduct (Ground Six) and of judicial misconduct (Ground Seven) is

8   similarly unavailing, as addressed below in connection with those discussions.

9       According the requisite deference to the state court results, it is recommended the Court find

10  that the court of appeal made objectively reasonable factual determinations from the record presented

11  in rejecting each of Estrada's challenges to the admission of particular evidence. His allusions to broad

12  constitutional principles, (FAP 50-58, ECF No. 74), cannot overcome the demonstration that the

13  evidence was relevant to issues in the case, and a jury could draw permissible inferences from it,

14  satisfying the federal due process standards articulated in Estelle, 502 U.S. at 68-70. Accordingly,

15  relief on Ground Four should be **DENIED**.

16      **G.    Ground Five:  Improper Jury Instruction**

17      Estrada alleges his constitutional right to a fair trial was violated when the "court improperly

18  instructed [the] jury on flight from crime." (FAP 11, 59 ECF No. 74.)  Defense counsel had objected

19  to the giving of the instruction, contending that Estrada's departures were "more like leaving" than

20  fleeing, the type of factual determination actually reserved to the jury.  (RT vol. 15 of 23 at 2278-

21  2280.)  Estrada similarly argues his departures from both the Sanchez residence and the Oceguera

22  garage occurred after he was told to leave, contending that circumstance "significantly diluted any

23  inference of 'consciousness of guilt,' " and further contends giving the instruction was prejudicially

24  improper because his leaving "was not relevant to the jury's decision on the issue of his mental state."

25  (FAP 64, 59, ECF No. 74.)  Respondent argues that the giving of the flight instruction  presents no

26  cognizable federal question and that the claim was reasonably rejected by the state court on direct

27  appeal, foreclosing habeas relief.  (Ans. 48, ECF No. 78-1.)  The instruction at issue is CALJIC 2.52

28  (Flight After Crime), which provides in its entirety:

1              The flight of a person immediately after the commission of a crime is not
2      sufficient in itself to establish his guilt, but is a fact which, if proved, may be
       considered by you in the light of all other proved facts in deciding whether a defendant
       is guilty or not guilty. The weight to which this circumstance is entitled is a matter for
3      you to decide.

4  (RT vol. 16 of 23 at 2593; *see* CT vol. 2 at 219; *see also* Lodg. No. 4, slip op. at 28.)

5          "[I]nstructional errors of state law generally may not form the basis for federal habeas relief."

6  Gilmore v. Taylor, 508 U.S. 333, 344 (1993), *citing* Estelle, 502 U.S. 62. Before federal habeas relief

7  is warranted in this context, the "ailing instruction by itself [must be found to have] so infected the

8  entire trial that the resulting conviction violates due process," when "considered in the context of the

9  instructions as a whole and the trial record." Estelle, 502 U.S. at 72, *quoting* Cupp v. Naughten, 414

10  U.S. 141, 147 (1973); *see* Henderson v. Kibbe, 431 U.S. 145, 154 (1977) (the standard is whether there

11  is a reasonable likelihood that the jury applied the instruction in a way that violated the Constitution).

12          The court of appeal concluded that the giving of the flight instruction was amply supported by

13  the record and by "controlling [state] Supreme Court case law," and found it was not only permissible

14  but required under the notes to Cal. Penal Code § 1127(c): "In any criminal trial or proceeding where

15  evidence of flight of a defendant is relied upon as tending to show guilt, the court shall instruct the jury

16  [with the standard flight instruction]." (Lodg. No. 4, slip op. at 32.) The instruction "give[s] the jury

17  sufficient guidance in assessing evidence that arguably reflects flight" and informs the jury "that the

18  weight to afford such evidence is for the jury to decide." (Id. at 28, 29, 32.) The court explained:

19              While not particularly strong in terms of "flight," the record does contain
       sufficient evidence to support the giving of the challenged instruction. Sanchez
20      testified that Estrada abruptly departed from her home after assaulting Silva, when she
       yelled "get the hell out of my house or else I [am] going to call the cops." A police
21      officer who interviewed Sanchez shortly after the assault added that Sanchez told him
       after hitting Silva with the gun, Estrada said he did not care if she called the police and
22      then left "in a quick manner." Given this evidence, the prosecutor was entitled to argue
       that Estrada's abrupt departure from the residence, particularly after the suggestion that
23      the authorities would be summoned, indicated a consciousness of guilt.

24  (Lodg No. 4, slip op. at 28-29: "Estrada's [further] contention [based solely on state law] that the

25  instructions should not have been given because only his mental state at the time of the assault, not his

26  identity, was at issue has been repeatedly rejected by our Supreme Court" (citations omitted).)

27          Misstating the import of the instruction in an attempt to inflate this state law claim to

28  constitutional proportions, relying on an unpreserved objection to its text, Estrada argues here:

                                          39                              10cv2014-DMS(KSC)

1   The instruction thus permitted the jury to short-circuit their decision-making process,
    by reasoning that if the defendant believed he was guilty, then surely he must be guilty.
2   Under these circumstances, the instruction created a substantial risk of conviction
    without proof of all essential facts beyond a reasonable doubt, thus lessening the
3   prosecution's burden of proof.

4   (FAP 61, ECF No. 74.)

5       Contrary to Estrada's argument and the pernicious effect he describes, the flight instruction

6   does not give the jury "*carte blanche* to use the evidence in any way they wished" absent "necessary

7   guidance." (FAP 61-63, ECF No. 74.) The instruction language advises the jury to determine, as a

8   factual matter, whether his departures constituted "flight," and only then to assess the probative value

9   of that fact, like any other fact. The language sufficiently brackets the permissible uses of the evidence

10  in consideration of the instructions as a whole and the trial record to avoid a constitutional concern.

11  *See* Henderson, 431 U.S. at 154; Estelle, 502 U.S. at 71-72. Courts presume that jurors follow the

12  instructions they are given, absent evidence suggesting otherwise. Weeks v. Angelone, 528 U.S. 225,

13  234 (2000). Relief on Ground Five should be **DENIED**.

14      **H.    Ground Six:  Judicial Misconduct**

15      As Ground Six, Estrada makes several claims under the heading of judicial misconduct that

16  he contends deprived him of his Fourteenth, Fifth, and Sixth Amendment rights to a fair trial. (FAP

17  66-78, ECF No. 74.) All but two of these claims challenge the trial court's exercise of its discretion

18  in the admission of evidence at trial.

19          **1.    Legal Standards**

20      A petitioner may not "transform a state-law issue into a federal one merely by asserting a

21  violation of due process." Langford v. Day, 110 F.3d 1380, 1389 (9th Cir. 1996). On federal habeas

22  review of a state trial judge's conduct, the issue is not the presence of judicial misconduct. Rather, a

23  federal habeas court must decide whether, in the context of the trial as a whole, "the state trial judge's

24  behavior rendered the trial so fundamentally unfair as to violate federal due process. . . ." Duckett v.

25  Godinez, 67 F.3d 734, 740 (9th Cir. 1995) (citations omitted).

26          **2.    Evidentiary Rulings**

27      "The Due Process Clause does not permit the federal courts to engage in a finely tuned review

28  of the wisdom of state evidentiary rules." Marshall v. Lonberger, 459 U.S. 422, 438, n. 6 (1983).

1   Federal habeas relief is only available if the challenged evidentiary ruling "rendered the trial so

2   fundamentally unfair as to violate due process." Larson, 515 F.3d at 1065.

3        Estrada's  repackaging as instances of  "judicial misconduct" the trial court's admission of

4   People's Exhibits 10, 11, 12 at his trial, the documents found among Miguel Thompson's papers in the

5   cell he shared with Estrada, fares no better under this theory than the claims did under a theory of

6   evidentiary error, for the same reasons as discussed in Ground Four.   Concerning Exhibit 12, the

7   "Oceguera script", Estrada imaginatively adds here: "Defendant's statement of events on the script was

8   a now [sic] 'coerced' confession. . . ." (FAP 69, ECF No. 74, arguing: "Though nothing was signed

9   it's worse on defendant, Joey Estrada's, written script to attorney, was coerced by the trial judge when

10  he ruled to admit[] the script into evidence" (emphasis in original).)

11       Estrada appears to suggest the Court should deem the unsigned "Oceguera script" document

12  he privately penned, without any involvement by the State or the court, to be an unconstitutionally

13  coerced confession, relying on an attempted analogy to facially inapposite case law involving custodial

14  confessions.  See Payne v. Arkansas,  356 U.S. 560 (1958) (reversing a judgment on due process

15  grounds where a confession used against him at trial was extracted from a 19-year-old suspect arrested

16  without a warrant, held incommunicado for three days, was not informed of his rights to remain silent

17  and to counsel, and was made abjectly fearful by the chief of police); see also Haynes v. Washington,

18  373 U.S. 503 (1963) (vacating a judgment on grounds the defendant's written confession was

19  involuntary and inadmissible because it was made while the police held him incommunicado and told

20  him he could not communicate with his wife until after he made the written confession).[11]  The trial

21  judge obviously played no role in the existence or content of the script, and the court amply explained

22  on the record the admissibility and relevance of that evidence.

23       Estrada also argues that the admission of the Exhibit 11 police report entailed judicial

24  misconduct because the trial court failed to adhere to an agreement among counsel and the court that

25  the exhibit would only go to the jury if they requested it.  If they did, the court agreed to provide the

---

26

27

28  [11] Estrada's additional cited authority, Fahy v. Connecticut, 375 U.S. 85 (1963) and Penry v. Johnson, 532 U.S. 782 (2001) are even further off point.

1  jury with additional instructions to ignore the hearsay portions of that report. (RT vol. 17 of 23 at

2  2791-2794.)   Both Exhibits 11 and 12 are identified in the trial Exhibit List Index as already

3  "Admitted" by the time those discussions occurred, as confirmed during the hearsay concern

4  discussion. (Id.; see also RT vol. 0 of 23: "People's Exhibit No. 11[,] Jail Documents / Incident

5  Report [,] Identified [RT at 1759,] Admitted Into Evidence [RT at 1851]"; "People's Exhibit No. 12[,]

6  Jail Documents / Script[,] Identified [RT at 1760,] Admitted Into Evidence [RT at 1851]".)  Even

7  assuming the jury received Exhibit 11 without the special handling the parties and court discussed,

8  Estrada does not identify any particular statement(s) in the report he alleges could qualify as unduly

9  prejudicial hearsay and does not otherwise demonstrate that the handling of Exhibit 11 "rendered the

10  trial so fundamentally unfair as to violate due process." Larson, 515 F.3d at 1065; see Estelle, 502

11  U.S. at 67-68.

12       Finally, Estrada vaguely adds that the use at trial of People's Exhibits 18 and 19, routine and

13  innocuous police evidentiary photographs from the scenes of the assault and of the burglary, were

14  instances of judicial misconduct. (FAP 12, ECF No. 74.)  Both photographs were authenticated by

15  investigating police officers, and their use presents no federal question. Estrada has failed to raise any

16  constitutional concern associated with the trial court's conduct in this regard.

17       **3.       Judicial Pressure To Reach A Verdict**

18       Estrada argues that the trial court purportedly "pressure[d] the jury into a verdict, by rushing

19  them when they were confused with instructions on the forms." (FAP 70, 71, ECF No. 74: "The judge

20  kept the jury hostage in a legal way," purportedly influencing the verdict, releasing them "at 6:12 p.m.

21  after they had given the judge a verdict of guilty," citing CT vol. 3, p. 597.)  He speculates that the

22  jurors had "obligations" or "plans made around 5:00 - 5:30 p.m.," they "now see they are kept from that

23  obligation and pressured into a verdict" while "tired, hungry and frustrated and who knows what else

24  we are left to imagine in our minds...." (Id.)  From those musings, he would have the Court impute

25  to the trial court coercive interference in the determination of Estrada's guilt or innocence in violation

26  of his due process rights.

27       Respondent accurately observes: "there is nothing to indicate that the trial court demanded the

28  jury deliberate until they came to a decision on that day." (Ans. 54, ECF No. 78-1.)  The record

1   contains no foundation for Estrada's jury coercion claim.  The jury began deliberations on Friday

2   afternoon, September 16, 2005.  At that time, Juror No. 11 forwarded a note to inform the court that

3   effective that date, her employer would no longer pay her during her jury service.  On Monday at 10:00

4   a.m., while the other jurors were excused for a short break, the court and counsel discussed her

5   situation with Juror No. 11, who told them she could manage only about two days without pay.  (RT

6   vol. 19 of 23 at 3001-3006.)  Court and counsel thereafter discussed options.  The prosecutor indicated

7   he had no objection if the defense preferred to excuse that Juror No. 11 and seat one of the alternates.

8   Defense counsel expressed as his only concern that Juror No. 11 might rush to a verdict and suggested

9   the court give a "generalized instruction about not rushing the verdict." (Id. at 3005-3007.)  The court

10  agreed with the prosecutor that such an instruction would be premature after just three hours of

11  deliberation, in express consideration of the need to avoid pressuring the jury or influencing their

12  deliberations.  (Id. at 3008.) The court had the jury resume their deliberations, intending to check in

13  with Juror No. 11 at the end of the day.  (Id. at 3007-3008.)

14         The jury informed the court at 4:40 p.m. that day that they had reached their verdicts on all

15  counts. They found Estrada not guilty on two of the counts, but guilty on the six other counts. (Lodg.

16  No. 16, CT vol. 3 at 596.) After the verdict forms were read, the court and counsel determined at a

17  sidebar conference the forms were incomplete.  At 5:06 p.m., the jury retired to conform the guilty

18  verdict forms to accurately reflect the details of their findings.  Court reconvened at 5:20 p.m. for

19  rereading of those verdicts.  A sidebar conference interrupted that reading, and the court again

20  instructed the jury on needed clarifications that required they re-mark the verdict forms associated with

21  Counts 3, 5, and 6.  (Id.) The jury again retired to conform the verdict forms.  They returned at 6:02

22  p.m. with all the verdict forms correctly filled out.  (Id.)  The court polled them collectively to ensure

23  the final verdicts as read were as they all intended, then dismissed the jury.  (Id. at 597; see  RT vol.

24  20 of 23 at 3259-3282.)

25         The record reveals the jurors reached their verdicts within the normal business day without

26  any external interference from the court.  The regularizing of the multiple complex verdict forms and

27  their subparts merely required that they perform the ministerial task of conforming the forms to record

28  the detail of their actual findings.  That task consumed approximately one additional hour beyond their

1  announcement they had reached their verdicts.  It is recommended the Court find that Estrada's

2  characterization of the foregoing sequence of events as grounds for habeas relief due to improper

3  judicial interference in the deliberation process is frivolous.

### 4.   Gang Affiliation Evidence

5  Estrada posits as an additional instance of purported judicial misconduct that the judge

6  "allowed the D.A. to portray Defendant as a gang member during jury voir dire" in the second trial.

7  (FAP 71-72, ECF No. 74.)  As mentioned above in connection with Ground One, counsel inquired of

8  the prospective jurors during voir dire their exposure to or familiarity with guns, gangs, and drugs, as

9  those issues would be mentioned during the trial testimony.  Estrada argues he is not "a documented

10  gang member" and "the case had nothing to [do] with a gang or for the benefit of a gang." (Id. at 72.)

11  He contends the term "Mexican Mafia" should not have been used during voir dire or "admitted along

12  with People's Exhibits # 10, 11, 12. . ." (Id. at 73; see also Traverse 79-81, ECF No. 95.)

13  Estrada identifies no instance in which he was personally "portrayed" as a gang member, before

14  or during trial.  The context in which references to a gang arose at trial was only associated with

15  Miguel Thompson and the discovery of the "Oceguera Script" in his administrative segregation jail cell

16  shared with Estrada.  That claim is discussed and disposed of above, in connection with FAP Ground

17  Four.  Even assuming the Court could reach the claim in this context, his challenge is inchoate and

18  elaborates no federal constitutional question.

### 5.   Self-Incrimination And Purportedly Perjured Testimony

20  Estrada alludes to the trial court's purported infringement of his right to remain silent "during

21  a 402 evidence hearing," although his citations to the record do not correspond to any such proceeding.

22  (See FAP 66, ECF No. 74.)  He fails to explain how that or any other Fifth Amendment violation

23  occurred in that or any other connection attributable to conduct by the trial court.  Estrada also alleges:

24  "The judge allowed Chrispina Sanchez to com[m]it[] perjury, in the gun allegation case." (FAP 77,

25  ECF No. 74.)  He elaborates in Ground Seven his arguments on the issue of Sanchez's trial testimony

26  and the alleged misconduct of both the trial court and the prosecutor in that regard.  That claim is

27  addressed and disposed of below.  On habeas review, a federal court asks only "whether the state trial

28  judge's conduct rendered the trial so fundamentally unfair as to violate federal due process under the

1  United States Constitution." Duckett, 667 F.3d at 740.  The answer on this record is no, under any of

2  his theories, and relief on Ground Six should be **DENIED**.

3     **I.     Ground Seven:  Prosecutorial Misconduct**

4        The record discloses that Estrada personally articulated prosecutorial misconduct arguments

5  at one of his Mardan hearings, after his conviction and prior to sentencing, arguments the trial court

6  construed as an oral motion for a new trial.  The court grouped his criticisms into categories, then

7  rejected each challenge separately, for the reasons recited on the record.  (RT vol. 21 of 23 at 3508-

8  3514.) Estrada relies here on just three discernably discrete issues on this theory, despite the breadth

9  of his narrative complaints.  One relates to the testimony of Chrispina Sanchez associated with the

10  2002 assault charges.  Another alleges the prosecutor lied in order to have the court admit Exhibit 18,

11  the photo of a damaged door frame. The third relates to the testimony of Mrs. Oceguera.

12     **1.     Legal Standards**

13        On federal habeas review, "the standard of review for a claim of prosecutorial misconduct, like

14  the standard of review for a claim of judicial misconduct, is the narrow one of due process, and not

15  the broad exercise of supervisory power."  Duckett, 67 F.3d at 743, *citing inter alia* Darden v.

16  Wainwright, 477 U.S. 168, 181 (1986). Prosecutorial misconduct violates the Constitution only when,

17  in the context of the entire trial, the misconduct "so infected the trial with unfairness as to make the

18  resulting conviction a denial of due process."  Darden, 477 U.S. at 181, *quoting* Donnelly v.

19  DeChristoforo, 416 U.S. 637, 643 (1974); *see* Greer v. Miller, 483 U.S. 756, 765 (1987).  "That

20  standard allows a federal court to grant relief when the state-court trial was fundamentally unfair but

21  avoids interfering in state-court proceedings when errors fall short of constitutional magnitude."

22  Drayden v. White, 232 F.3d 704, 713 (9th Cir. 2000).

23        Estrada first raised a prosecutorial misconduct claim in his second, summarily denied habeas

24  petition to the California Supreme Court, Case No. S197184.  (Lodg. No. 13.)  No reasoned state court

25  decision addresses the merits of this ground for relief.  It is recommended the Court find, under either

26  independent review or *de novo* review, that Estrada fails to demonstrate entitlement to federal habeas

27  relief on any of his alleged prosecutorial misconduct claims, for the following reasons.

28  / / /

### 2.   Chrispina Sanchez's Testimony

Estrada alleges that his rights to due process and a fair trial were violated when the "prosecutor lied to judge and jury to get illegal evidence admitted into evidence to convict" him, relying on Chrispina Sanchez's admission at his second trial that she had lied during her prior testimony regarding his assault with a gun. (FAP 13, 79, ECF No. 74.) Estrada summarizes this claim:

> Referring to the gun allegation case it was prosecutorial misconduct. Prosecutor['s] star witness Chrispina Sanchez, com[m]itted perjury in highest degree. [¶] She told the prosecutor, judge and jury "she lied"[.] [¶] The prosecutor nor the judge told Sanchez anything, nor did the prosecutor or the judge ask witness Sanchez, as to what else she was exactly lieing [sic] to in the case and exactly who else she lied to[]. [¶] The prosecutor nor the judge told the jury that Ms. Chrispina Sanchez, lied willfully and knowingly committed perjury to a whole jury from the first trial because perjury came in the 2nd trial. (Petitioner Joey Estrada was denied due process of law.) [¶] The jury was never instructed, nor was the truth searched to the ends of justice, nor was Chrispina Sanchez, prosecuted for perjury.

(FAP 13, 25-26, ECF No. 74, *citing* "Reporter's Appeal Transcript Volume 6, pages 820-821, August 30, 2005".)

When a claim of misconduct arises in connection with a prosecutor's alleged presentation of material false testimony, a due process right is implicated.  "[I]t is established that a conviction obtained through use of false evidence, known to be such by representatives of the State," violates a criminal defendant's Fourteenth Amendment due process rights. Napue v. Illinois, 360 U.S. 264, 269 (1959).  "The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." Id.  Such an error does not require a new trial unless " 'the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury.' " Giglio v. United States, 405 U.S. 150, 154 (1972), *quoting* Napue, 360 U.S. at 271. A " 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." Pennsylvania v. Ritchie, 480 U.S. 39, 57 (1987), *quoting* United States v. Bagley, 473 U.S. 667, 782 (1985); *see* Smith v. Cain, __ U.S. __, 132 S. Ct. 627, 630 (2012).

Before Estrada's second trial began, the trial court and counsel reviewed in considerable detail a selection of excerpts from the testimony Chrispina Sanchez gave at his first trial.  It is apparent from the record that the parties anticipated she would lie at the second trial.  The prosecutor argued in connection with his intended use of her prior testimony:

1
2
3

. . . [W]hen she testified at the first trial, it's our position . . . that she saw the events that happened, she told the police on the night in question the truth, implicating the defendant and the hitting with a firearm, and then since that time, through various factors, has decided not to be candid and tell the truth.

(RT vol. 8 of 23 at 527-528, 532.)

Sanchez was indeed an uncooperative prosecution witness at Estrada's second trial.  Her trial testimony is provided in Lodgment No. 17, RT vol. 9 of 23 at 752-819.  She made representations inconsistent with prior factual statements she had made, and repeatedly answered "I don't remember" on material issues.  (*See* Ans. 55-57, ECF No. 78-1, *citing* "6 RT 776-777.")  She was thoroughly impeached on the record with her inconsistencies.

Sanchez testified that she and Juan Silva were both still up using methamphetamine at the late hour when Estrada came over to tell her something about her cousin's stolen van. (RT vol. 9 of 23 at 754-758.) She had a "loud" conversation with Estrada, but she denied they were arguing, although she admitted "getting angry. . . because he was interrupting her high." (Id. at 766-767.)  She witnessed Estrada and Silva fighting or "scuffling." (Id. at 771.) She had no guns in the house and, as far as she knew, Silva did not either. (Id. at 759-762, 774-75.)  While a bloodied Silva was getting up off the floor, Sanchez testified she yelled at Estrada to get out of her house or she would call the police. Estrada then left in a car. (Id. at 772-774, 776-777.) She gave no evidence about Estrada's possession and use of a gun, and she testified she could not remember anything she told the 911 dispatcher. (Id. at 775-779.)  Faced with material differences in her testimony at the second trial compared to her testimony at the first trial, to her statements to police who investigated the assault, and to her statements to the 911 operator, the prosecutor impeached Sanchez, stepping her through some of those discrepancies.  For example:

> Q:  Did you say that Mr. Silva and Joe got into an argument because Silva was trying to intervene in the argument between you and Joe?
>
> A:  Yeah.
>
> Q:  And then did you say that Joe became angry and pulled out a black, semiautomatic pistol from his right front waistband and began pointing it at them, at you, all of you? Did you tell the cop that?
>
> A:  I don't remember.

(RT vol. 9 of 23 at 786-787.)

1    Using a detective's report from an interview with Sanchez shortly after the incident, the

2 prosecutor emphasized for the jury the selectiveness of her memory. She answered "no" or "I don't

3 remember" when asked to confirm material statements from the report, such as: "Did you then tell the

4 cop that Joe began to strike Mr. Silva in the head with the pistol grip end of the gun two to three

5 times?" and "Did you say then Joe put the gun back in his front waistband and left in a newer model

6 Mercury Mystique, lavender in color?" (RT vol. 9 of 23 at 788.) She testified that she thought she

7 may have told the detective that she and Estrada argued about her cousin's van and that "Mr. Silva tried

8 to break it up between you and Joey," but that she did not remember telling the detective that Estrada

9 "got really angry and pulled a gun" or that he pointed the gun at all of them and started hitting Silva

10 in the head or that he put the gun in his waistband and drove away. (Id. at 790-92.) Sanchez denied

11 that she and the detective ever went over what happened the night of the assault:  "But everything

12 you're telling me [from the police report], that's not what I told -- what I just said right now, [the

13 officer] was upset with me because I wouldn't pinpoint somebody out." (Id. at 791.) She denied she

14 lied to the detective, but stated she did not know why she told "one thing one time and one thing

15 today." (Id. at 794-795.)

16    Similarly, Sanchez testified that if she had told the police dispatcher the things the prosecutor

17 read to her from the record, she would "probably not" have been telling the truth. She stated that she

18 was not "honest when she spoke on the phone." (RT vol. 9 of 23 at 779-780.) Sanchez plainly did not

19 want to be testifying against Estrada (or anyone else) and expressed fearfulness of retaliation. The

20 prosecutor highlighted that at the first trial, she was asked: "If you had seen Mr. Estrada with a gun

21 that night, and he had pointed it at you and he had hit Mr. Silva in the head with it, would you come

22 in here and tell the jury that?" (Id. at 783-784.) She admitted her response at the first trial was that

23 she "wouldn't be able to answer that question" because she wouldn't want to be a rat. (Id. at 783-784.)

24    [THE PROSECUTOR]:  And the same thought goes in front of this jury; isn't that
     right, Chrispina? [¶]  Even if you saw Mr. Estrada do those things, you wouldn't tell
25    these folks because you don't want to rat; isn't that true?

26    A: Yes.

27 ( RT vol. 9 of 23 at 785.)

28    On cross-examination, Sanchez reiterated that she would not testify that either Silva or Estrada

had a gun, to avoid being a snitch. (RT vol. 9 of 23 at 810-812.) She categorically denied seeing any gun that night, having any gun pointed at her, or seeing anybody point a gun at anyone else. (Id. at 814-815.) Far from relying on "false evidence" allowed to go uncorrected at trial in order to obtain a conviction, as Estrada argues, the prosecutor laboriously highlighted for the jury's credibility determinations Sanchez's inconsistent versions of events, including eliciting from her the statement "I lied."

> Q: When you indicated that you wouldn't implicate Mr. Silva either because you'd get a rat jacket, . . . [¶] you didn't tell the [dispatcher or the] cops Mr. Silva had a gun, did you?
>
> A: No.
>
> Q: So if you did tell the dispatcher and the cops that somebody had a gun, you wouldn't have been afraid at that time of getting a rat jacket, right?
>
> A: Would I have been afraid?
>
> Q: Yeah.
>
> A: Yes.
>
> Q: So if you did tell them that, something must have scared you very badly that night, right?
>
> A: I was high; I was scared.
>
> . . .
>
> Q: It's only because of that fear that you decided to tell the cops what happened, right?
>
> A: I lied.
>
> Q: It's only because of that fear that you decided to name somebody as the man with the gun; isn't that true?
>
> A: Yes. I lied. I lied.
>
> Q: So you admit that you told the cops that Mr. Estrada had the gun and hit --
>
> A: Well, you read it to me.
>
> Q: -- Mr. Silva, right?
>
> A: I'm saying because you read it to me, you read it back to me.
>
> Q: You did tell the cops that, you're just saying you lied about it, right?
>
> A: No. I'm telling you . . . [¶] I'm telling you I lied.

1     Q: You just told the jury a lie?

2     A: Yeah. Well, talking to you, though, too.

3   (RT vol. 9 of 23 at 819-821.)

4          From this record, it is clear that the jury did not have false evidence known by the prosecutor

5   to be false concealed from them. Rather, they were exposed to the multiple contradictions,

6   inconsistencies, and accompanying inferences and were charged, as the ultimate triers of fact, to sort

7   them out.   Estrada's demonstration falls far short of substantiating prosecutorial (or judicial)

8   misconduct at the second trial on his theory that Sanchez committed uncorrected perjury. *See* Darden,

9   477 U.S. at 181; Napue, 360 U.S. at 269.

10              **3.     Purported Misrepresentation Re: Photographic Exhibit**

11          Estrada alleges that the introduction of the Exhibit 18 photograph of the damaged door at his

12   aunt's house where he was arrested the day after the Oceguera burglary he had challenged under

13   Ground Four as inadmissible evidence also constitutes an instance of prosecutorial misconduct. He

14   argues the prosecutor "lied, willfully and knowingly to the trial judge" in order to have the exhibit

15   admitted when he represented to the court that it was offered for impeachment purposes on grounds

16   of "inconsistent prior statement" because "nowhere in the reading of the prior trial transcript does

17   defendant say 'there was no broken doors in the house.' " (FAP 80, ECF No. 74.) He argued the

18   prosecutor then improperly tried "to make the jury believe that the defendant broke and shattered my

19   cousin Salvador Moran's bedroom door." (Id. at 81.)

20          Be that as it may, the prosecutor also identified for the court other permissible inferences he

21   intended to argue from the Exhibit 18 photograph as "go[ing] to intent, what [Estrada] was doing that

22   day. He was stealing. . . ." (RT vol. 13 of 23 at 1967; *see also* Ground Four, above.) A permissible

23   inference from the challenged evidence is all that is required in this regard to avoid a federal

24   constitutional concern. Estelle, 502 U.S. at 70; Larson, 515 F.3d at 1065; Jammal, 926 F.2d at 920.

25          It is recommended the Court find, whether under a theory of improper admission of evidence,

26   a theory of judicial abuse of discretion, or a theory of prosecutorial misconduct in its introduction,

27   Estrada's challenges to the particular trial exhibits raises no federal constitutional concern.

28   ///

#### 4.    Maria Oceguera's Testimony

Mrs. Oceguera described in detail her discovery of Estrada in her garage at about 4:00 a.m. on May 29, 2004 when she was preparing to leave for work, their interactions at that time, certain conditions in the garage, and Estrada's attempt to prevent her from using her key to reenter her house. She authenticated photographs of her residence and the garage interior. (RT vol. 10 of 23 at 1009-1051, RT vol. 11 of 23 at 1251-1284.) Estrada interrupted Mrs. Oceguera's testimony with an outburst objecting to her being on the stand.  He demanded that the prosecutor be "arrested for perjury" based on an extra-judicial incident from his first trial that he represented showed that Mrs. Oceguera intended to lie and the prosecutor knew it.  (Id., RT vol. 10 of 23 at 1012-1016.)  The court recessed the jury and admonished Estrada that it was for the jury to determine whether a witness is lying or telling the truth, through the process of cross-examination and impeachment. (Id. at 1017.)

Defense counsel stated he was aware of the issue Estrada raised, but had determined "there is absolutely no rationale to keep her from even testifying based on the previous trial transcript." (RT vol. 10 of 23 at 1018-1019.)  On cross-examination, counsel made the jury aware of the incident, eliciting Mrs. Oceguera's admission that during a previous appearance in Estrada's case, she made an out-of-court statement to Estrada's defense counsel having potential bearing on her credibility:

> Q: . . . Did you speak to anybody that represented Mr. Estrada during the [preliminary] hearing when it was going on, but outside of the court?
>
> A:  You mean [Estrada's prior counsel] Ms. Navarro?
>
> Q:  Ms. Navarro.
>
> A:  Yes.
>
> Q:  Did you indicate that if you were going to be called back and asked questions, that you were going to answer it [sic] differently than you had already answered it from [the prosecutor]?
>
> A:  Yes.

(RT vol. 11 of 23 at 1265-1266; see also id. at 1271-1272.)

Both counsel explored with Mrs. Oceguera in front of the jury portions of her prior testimony on such issues as Estrada's grabbing her hand and what she told her husband, in order to rehabilitate or to impeach the details she was giving at the second trial. (RT vol. 11 of 23 e.g. 1278-1280.)  She

admitted that she was "afraid" and did not want to be there. (RT vol. 10 of 23 at 1021-1022.) Thus, her state of mind and testimonial inconsistencies were fully exposed to the jury, the sole arbiters of credibility, not concealed or manipulated by the prosecutor. (*See* RT vol. 21 of 23 at 3511 (trial court's discussion of this issue at the time it rejected it as a ground for new trial).) Estrada fails to demonstrate any misconduct in this regard. Darden, 477 U.S. at 181, Greer, 483 U.S. at 765. Moreover, the jury acquitted Estrada of the charges associated with Mrs. Oceguera as a victim of false imprisonment. Absent prejudice, even constitutional error provides no basis for federal habeas relief. Brecht, 507 U.S. at 637-38; *see* Baines, 204 F.3d at 977.

In summary, the record does not raise any due process concern associated with the prosecutor's challenged conduct, applying either an independent or a *de novo* standard of review. Accordingly, relief on Ground Seven should be **DENIED**.

**J.      Ground Eight:  Ineffective Assistance Of Counsel ("IAC")**

Estrada alleges his trial attorney "did bad prejudicial acts against his client going over his objections as to strategy & evidence, failed to locate witnesses, and lieing [sic] to his client," in violation of his Sixth and Fourteenth Amendment rights. (FAP 14, ECF No. 74.) Respondent characterizes these claims as "vague and conclusory" and "speculative," foreclosing federal habeas relief. (FAP 57, 59, ECF No. 8-1.)

There is no reasoned decision from the state courts on this issue. (Ans. 58, ECF No. 78-1.) Estrada did not raise any IAC claims until his summarily-denied second habeas petition to the California Supreme Court in Case No. S197184. (Lodg. Nos. 13, 15.) With respect to the merits of his IAC claims, under either independent review applying AEDPA deference or under *de novo* review, it is recommended the Court find none of Estrada's IAC claims warrants federal habeas relief.

**1.      Legal Standards**

A defendant claiming ineffective assistance of counsel must show both (1) deficient performance under an objective standard of reasonableness and (2) prejudice.  Strickland v. Washington, 466 U.S. 668, 687 (1984).  To demonstrate deficient performance, "[t]he challenger's burden is to show 'that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.' " Richter, 131 S.Ct. at 787, *quoting*

1    Strickland, 466 U.S. at 687. To demonstrate prejudice, the petitioner must show that "but for counsel's

2    unprofessional errors," there is a reasonable probability "the result of the proceeding would have been

3    different." Strickland, 466 U.S. at 690, 694 ("A reasonable probability is a probability sufficient to

4    undermine confidence in the outcome"); see Richter, 131 S.Ct. at 792 ("The likelihood of a different

5    result must be substantial, not just conceivable"); see also Wiggins v. Smith, 539 U.S. 510, 521 (2003).

6    "Because failure to meet either [Strickland] prong is fatal to [an IAC] claim, there is no requirement

7    that we 'address both components of the inquiry if the defendant makes an insufficient showing on

8    one.'" Gonzalez v. Wong, 667 F.3d 965, 987 (9th Cir. 2011), quoting Strickland, 466 U.S. at 697; see

9    Bell v. Cone, 535 U.S. 685, 695 (2002).

10        Attorneys "are presumed to have rendered adequate assistance and made all significant

11   decisions in the exercise of reasonable professional judgment." Strickland, 466 U.S. at 690;

12   Kimmelman v. Morrison, 477 U.S. 365, 381 (1986) ("There is a strong presumption that counsel's

13   performance falls within the 'wide range of professional assistance' . . .") (citation omitted). "[T]he

14   defendant bears the burden of proving that counsel's 'representation was unreasonable under prevailing

15   professional norms and that the challenged action was not sound strategy." Kimmelman, 477 U.S. at

16   381. Federal habeas courts must ask whether, in light of all the circumstances, "there is any

17   reasonable argument that counsel satisfied Strickland's deferential standard" associated with the

18   alleged instance of IAC, not "whether counsel's actions were unreasonable." Richter, 131 S.Ct. at 785,

19   788; see Knowles v. Mirzayance, 556 U.S. 111, 123 (2009).

20            **2.    Failure To Investigate And Locate Witnesses**

21        Trial counsel are accorded broad latitude in the assessment and conduct of a case. Cullen, 131

22   S.Ct at 1400-01; Strickland, 466 U.S. at 689. A defendant's mere disagreement with the strategies,

23   tactics, and case presentation choices made by defense counsel is insufficient to support a finding of

24   constitutionally ineffective representation. A petitioner cannot overcome the presumption that

25   counsel's actions were the result of reasonable choices merely by identifying other strategies counsel

26   could have pursued. See Siriprongs v. Calderon, 133 F.3d 732, 736 (9th Cir. 1998).

27        "[T]he duty to investigate and prepare a defense is not limitless; it does not necessarily require

28   that every conceivable witness be interviewed" or that every item of potential evidence be examined.

1  Hendricks v. Calderon, 70 F. 3d 1032, 1040 (9th Cir. 1995) (internal punctuation and citation

2  omitted). "An attorney need not pursue an investigation that would be fruitless, much less one that

3  might be harmful to the defense." Richter, 131 S. Ct. at 789–90. The scope of defense counsel's duty

4  in this regard encompasses those activities that may demonstrate "factual innocence, or that raise

5  sufficient doubt on that question to undermine confidence in the verdict." Bragg v. Galaza, 242 F.3d

6  1082, 1088 (9th Cir. 2001), citing Hart v. Gomez, 174 F.3d 1067, 1070 (9th Cir. 1999). "[I]neffective

7  assistance claims based on a duty to investigate must be considered in light of the strength of the

8  government's case." Eggleston v. United States, 798 F.2d 374, 376 (9th Cir. 1986). Such claims are

9  "directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference

10  to counsel's judgments" in the making of strategic choices. Strickland, 466 U.S. at 690-91 ("In other

11  words, counsel has a duty to make reasonable investigations or to make a reasonable decision that

12  makes particular investigations unnecessary").

13          Estrada argues: "Trial lawyer never gave petitioner's story to the jury on how he was not able

14  to find witnesses to the 2002 gun allegation[]s case." (FAP 84, ECF No. 74.) At the time of Estrada's

15  first trial in April 2005, certain witnesses he "wanted to use" at his trial could not be located, even

16  though he "had my private investigator and my attorney try to locate [them], and they told me that they

17  can't find them." (See RT vol. 16 of 23 at 2549-2550.) Estrada also argues counsel should have

18  located Sandra Fernandez, another witness he alleges "would have rebutted the prosecution's case and

19  impeached Juan Silva's testimony" that he (Silva) had "never had a gun or seen a gun or held real gun,

20  in his hands, before the 2002 gun allegation case." (FAP 84, ECF No. 74.) He argues counsel should

21  also have found Erica Pacheko, who he represents could have impeached Silva's statement that he

22  "never went to the Pacheko residence" with others, among other things. (Id. at 85, 86.) His contention

23  appears to be that his self-defense theory would have been dispositively strengthened if his attorney

24  had located and called those witnesses to testify, if they had testified as he represents they would have,

25  if the jury had believed them, if the jury then drew the inferences that Silva had a tendency toward

26

27

28

1  aggressiveness, and if the jury then concluded Silva was the aggressor during the assault incident.[12]

2  Estrada provides no evidentiary support for his representations about the content of the testimony of

3  those potential witnesses. (*See* Ans. 60, ECF No. 78-1.)

4         The prerogative to decide questions of trial strategy and tactics for presentation of the defense

5  rests with counsel, including the decisions regarding which trial witnesses to call. *See* Taylor v.

6  Illinois, 484 U.S. 400, 418 (1988) (the ultimate decision not to call witnesses at trial is well within

7  counsel's "full authority to manage the conduct of the trial").

8         [C]omplaints of uncalled witnesses are not favored in federal habeas corpus review
          because allegations of what the witness would have testified are largely speculative. . . .
9         In addition, for [petitioner] to demonstrate the requisite *Strickland* prejudice, [he] must
          show not only that [the] testimony would have been favorable, but also that the witness
10        would have testified at trial.

11 Evans v. Cockrell, 285 F.3d 370, 377 (5th Cir. 2002) (internal punctuation and citations omitted).

12        Even crediting Estrada's contentions that those additional witnesses could have been located

13 and would have testified as he represents, it cannot reasonably be said that their evidentiary

14 contributions would have demonstrated Estrada's "factual innocence" or that their absence at trial was

15 likely to "raise sufficient doubt on that question to undermine confidence in the verdict," in

16 consideration of the strength of the prosecution's case   Bragg, 242 F.3d at 1088.  Defense counsel

17 actually alluded to absent witnesses as strengthening the defense case when he argued: "The 2002 old

18 case cannot be proven beyond a reasonable doubt.  The witnesses won't even testify.  The one that did

19 [referring to Silva], we are saying that he had the gun taken away from him [by Estrada] in self-

20 defense." (RT vol. 17 of 23 at 2814.)

21

22 _____

23 [12] Estrada also alleges IAC for trial counsel's failure to produce Linda Navarro, his lawyer at the first
    trial who, he contends, "interviewed Miguel Thompson [sic] at the Vista County Jail . . . ." (FAP 85, ECF No.
    74.) He represents that "she became a witness for defense [sic] in the second trial when Joe Cox was the trial
24  lawyer," and she should have been presented as a witness to the Thompson statement.  (Id.)  The record
    discloses that Ms. Navarro's only association with Estrada's second trial appears to have occurred on September
25  26, 2006, about a year after his conviction and before sentencing, when she briefly testified at the hearing of
    Estrada's new trial motion on the issue of alleged IAC for failure to investigate and to locate witnesses he
26  argued should have been called to bolster his defense to the 2002 assault charges. By the time of that hearing,
    Estrada was represented by new retained counsel.  After the court determined that Estrada had waived
27  attorney/client privilege by asserting an IAC claim, counsel from both his trials testified at the new trial motion
    hearing in that narrow regard. (RT vol. 23 of 23.) No interview with Thompson was mentioned. (Id. at 4541-
28  4545. The basis of this claim is at best unsubstantiated and inchoate.

1    Moreover, even crediting Estrada's representations about the content of the missing witness's

2    testimony, it would have supported only tangential issues outside the scope of defense counsel's duty

3    to investigate and present evidence likely to demonstrate factual innocence of the charged crime.

4    Bragg, 242 F.3d at 1088.  Their absence from trial does not "undermine confidence in the verdict,"

5    given the strength of the prosecution's case.   It is recommended the Court find Estrada fails to satisfy

6    either prong of the Strickland test on this theory.

7                                **3.      Toy Gun Exhibit Strategy**

8            Estrada argues defense counsel's decision to use a plastic replica of a semiautomatic handgun

9    as a demonstrative exhibit, admitted as Exhibit N, constituted prejudicial IAC.  Although Estrada's

10   statement of this claim is rather obscure, he contends he objected to "the toy replica gun trial lawyer

11   wants to bring into evidence." (FAP 86, ECF No. 74.)  The existence, source, nature, ownership, and

12   composition of the gun at issue in the assault case predictably featured prominently in the presentation

13   of his defense at trial.  At a minimum, it was material to the charge he was a felon in possession of a

14   firearm.  As noted by the trial court at the time Estrada admitted his prior felony conviction, before his

15   second trial began: "Well, he's stipulating that he suffered a prior felony conviction for purposes of

16   the charge of an ex felon in possession of a weapon, that would be count seven, so that the only issue

17   remaining on that is proving the possession of the weapon."  (RT vol. 8 of 23 at 526-527.)  The jury

18   also heard evidence of other instances where testifying witnesses saw Estrada in possession of a gun.

19   No object actually involved in any of those incidents was available at either of his trials.  Reaching the

20   merits of this claim under either deferential or *de novo* review, the record discloses this claim is

21   without merit under the Strickland standards.

22           Estrada ascribes a nefarious motive to his counsel's quintessentially strategic decision to use

23   the toy gun exhibit at trial: "The main reason this strategy fails is my lawyer did not believe his

24   client/defendant that Juan Silva pulled the gun out on me."  (FAP 86-87, ECF No. 74.)  He also

25   mistakenly represents that defense counsel only used the exhibit during his examination of Silva.

26           Why would you tell the D.A. you['re] going to use a toy replica in the case and then the
             D.A. warns Juan Silva that my trial counsel Joe Cox will bring a toy gun to show
27           J[ua]n Silva, and then Juan Silva, sa[y]s at trial "no" the gun was real that I used on
             him (Juan Silva).  That was a failed strategy and more-so, Joe Cox never asked the
28           other prosecution witnesses about the toy gun or put it out for them to testify on it.

                                                56                           10cv2014-DMS(KSC)

1  (FAP 87, ECF No. 74.)

2       Estrada's defense theory was that Silva drew a gun and threatened him with it.  He denied

3  pointing "a gun at anybody in the Sanchez residence" except in "self-defense when [Silva] pulled it

4  out on me" and he took it away from Silva.  (RT vol. 16 of 23 at 2557-2558.)  He denied ever hitting

5  Silva with the gun or pointing it at Chrispina.  (Id.)  As reproduced above, he testified he left the

6  Sanchez residence with the gun he took away from Silva, and did not realize it was not a real gun until

7  he got to his car.  He described it as "like a play gun," although he added that it was not "something

8  you could just look at and know it was a play gun," but rather "it looked kind of real and I kept it as

9  a memento of what happened at the incident." (Id. at 2547-2548; id at 2526-2532.)

10       The trial court described the Exhibit N object as "a plastic replica of a handgun" that appeared

11  to be "an automatic or semiautomatic where it would have a clip on the bottom inserted, and the top

12  has a slide to rack back . . . and looking at the tip of it, it does appear in all appearances, especially

13  from a distance, that it could possibly be a real gun." (RT vol. 8 of 23 at 511.) The court summarized

14  the thorough discussion associated with defense counsel's proposed use of a that exhibit from the

15  motions in limine hearing on August 24, 2006, before Estrada's second trial began. (Id. at 510-518.)

16      THE COURT: . . . Next issue that we discussed was the toy gun.  Now, there was a
statement that Mr. Cox made that he has a quote, "Airsoft Gun," end quote, which he

17  seeks to bring in as an exhibit, which he believes Mr. Estrada would authenticate as
similar to the item that Mr. Estrada had on November 16th during what we would call

18  an attempted suicide,. . . an incident that occurred outside the residence of Mr.
Estrada's father. [¶] The People's position in this regard, as I understand it, is basically

19  similar to the discussion in the first trial.  The People are arguing that the Sanchez
incident occurred November 4th, and the alleged attempted suicide occurred November

20  16, and that the gun or item used in the Sanchez incident is not necessarily the gun or
item used in the November 16 alleged attempted suicide.  And so the People are

21  arguing that it's not relevant, that it's not sufficiently shown that that was anything other
than a toy gun, because when the officers responded to the attempted suicide, what they

22  found was what some officers characterized as a toy gun.  And I believe Mr. Estrada's
father referred to it as a BB gun, and different persons characterized it in different

23  ways, but it was something other than a firearm.  [¶]  So the defense is requesting the
ability to use this Airsoft Gun . . . .

24  (RT vol. 8 of 23 at 510-511.)

25
26       Defense counsel argued for admission of the toy gun exhibit on grounds that he had been able

recently to find in commerce a realistic-looking plastic gun with a movable slide.

27

28      [DEFENSE COUNSEL]: . . . And the witnesses will either be able to say that looks
like the gun or not.  The police officer will be able to say whether that looks like the

gun or not. [¶] I think in the initial trial, there was some attempt to imply this was improbable to have a weapon like this, that it probably didn't occur. And as the court can see, these are available. [¶] So I think I should be allowed to use it, providing I plan to lay the proper foundation for it.

(RT vol. 8 of 23 at 517.)

The trial court also considered proffered evidence of two incidents separate from the charged crimes linking Estrada to possession of a gun. Estrada had gone to his parents's house in November 2002, a few days after the Sanchez assault, and appeared to hold a gun to his head, causing them to call police because they feared he was suicidal. The second incident was described by Mr. Oceguera. It involved a confrontation between them involving a 9 millimeter handgun in the same time frame. (*See* Ground Four discussion, above.) The court ruled that before the toy gun exhibit could be used, a proper foundation would have to be laid for the attempted suicide incident and then, upon a proper foundational showing, the People would be allowed to rebut that testimony with Mr. Oceguera's testimony about the "alleged 9 mil[l]imeter incident with Mr. Oceguera about six days later." (RT vol. 8 of 23 at 517.)

So with that threshold consideration tentative, given that if Mr. Cox lays the foundation for this, even with the dissimilarities that the People have pointed out, which is that nothing on this plastic replica appears to be aluminum, everything appears to be plastic and everything is black, does not have any aluminum-looking appearance, that would go to the weight as opposed to admissibility of using it as a demonstrative exhibit. . . . [A]nd certainly the People could impeach based on the prior testimony or other means of impeaching it in terms of how useful an exhibit it is, but the threshold foundation having been laid through one of the witnesses, the court's tentative would be to permit this to be used.

(RT vol. 8 of 23 at 517-518.)

As Estrada's second trial unfolded, those two incidents were presented to the jury. Estrada is simply wrong when he states his attorney did not use Exhibit N with any prosecution witnesses other than Juan Silva. (*See* FAP 87, ECF No. 74.) Defense counsel questioned Silva extensively about the nature and composition of the gun he testified Estrada used to assault him, using Exhibit N for comparative purposes both with respect to Silva's recollections and after Silva stated the gun Estrada used "looked exactly how the cops have," pointing to a gun worn in the courtroom by a sheriff's deputy. (RT vol. 9 of 23 at 875-881, 892-893.) But counsel also used Exhibit N for comparative and demonstrative purposes with several other witnesses, both defense and prosecution.

1      For example, Mr. Estrada, Sr. described the incident on November 16, 2002 when he and his

2  wife feared Estrada was suicidal. (RT vol. 14 of 23 at 2162-2196.) Counsel showed him Exhibit N.

3  Mr. Estrada stated that the exhibit resembled the toy gun he saw the night of the incident, but with no

4  metal pieces. (Id. at 2170-2172, 2196.) He acknowledged that at the first trial, when no such exhibit

5  was used, he had testified the item was a BB gun. (Id. at 2191-2192.) He testified that Estrada had

6  thrown the gun inside a motor home parked on their property by the time police arrived. The police

7  told his father that they "found the gun, but it's a toy gun" so not to worry about it. (Id. at 2189.) The

8  police left the gun in the trailer. Estrada's brother, Alfredo, testified he later retrieved it and described

9  the gun as looking something like Exhibit N, "but not exactly," contrasting certain features. (Id. at

10  2197-2201; *see also* RT vol. 15 of 23 at 2297-2301.)

11      Phil Bozarth, one of the police officers who responded to Estrada's parents' call, testified that

12  he found the gun in the trailer and determined that it was a toy with no evidentiary value associated

13  with Estrada's arrest. (RT vol. 15 of 23 at 2342-2343.) He described it as lightweight plastic that, in

14  his opinion, "could be mistaken for a real weapon" from a distance of seven or eight feet, but "[u]p

15  close you could tell it was a toy." (Id. at 2343-2344.) Defense counsel then showed him Exhibit N.

16  He acknowledged Exhibit N looked like "a well-made replica" of a Beretta that "resembles a handgun

17  that I carry" (id. at 2349-2350), whereas the item he found at the Estrada property "was something

18  really cheap and plastic like you get at the toy store" (id. at 2340). In the officer's opinion, if someone

19  were to take the toy plastic gun the police found in the trailer "and hit somebody on the head," he

20  would expect "the nature of the plastic" to break. (Id. at 2347.)

21      Defense counsel also used Exhibit N during his cross-examination of Javier Oceguera while

22  questioning him about the incident when he claimed Estrada had displayed a semiautomatic handgun.

23  (RT vol. 12 of 23 at 1533-1535.) Oceguera described Exhibit N as a toy gun resembling a "pretty real"

24  9 millimeter gun such as Estrada purportedly had. (Id. at 1534.)

25      Manifestly, given the charges against Estrada, the conflicting evidence about the nature of gun

26  associated with the assault charges would have to figure prominently in the jury's fact-finding process.

27  Estrada had testified he had the gun he took from Silva at his parents' house and that was the gun

28  police found in the motor home. (*See* RT vol. 16 of 23 at 2534-2535.) His detailed description of that

"very unique" aluminum and plastic gun differed substantially from Officer Bozarth's description of the gun he found there. (Id. at 2534-2535.) Defense counsel reasonably attempted to create doubt that the item was a real gun to undermine the prosecution evidence against Estrada and plausibly justified his strategy. Exhibit N demonstrated that sturdy plastic toy guns are available that bear considerable resemblance to real guns, and defense counsel was able to argue more effectively as a result.

> Remember [that] Officer Bozarth said that there was a gun. If you were real close, it looked plastic but [] from a distance, looked kind of real, even from a distance between where he was and you saw him here in court, he said that if somebody had pulled that gun out on him, he would have shot them. So that is why I called Juan Silva back because we got the report and that put toy gun in and [sic] around the time of this assault. [¶] You can't assault somebody with a toy gun, that is No. 1. Whether it looks like an automatic or whether it looks like a revolver, it is not assault with a deadly weapon if it is [a] toy gun.

(RT vol. 17 of 23 at 2797-2798; see also id. at 2813-2814: "We are saying that when he took that gun away from . . . Juan Silva, that is an act of self-defense because this is a toy gun that looks real.")

From this record, use at trial of a realistic-looking toy gun exhibit falls squarely within the broad range of legitimate trial tactics, the exclusive province of defense counsel. Applying either the double deference on federal habeas review accorded to the merits decisions of state courts, or applying the de novo standard of review, it is recommended the Court find this claim is without merit.

### 4.   Miscellaneous Alleged Deficiencies In Conduct Of Defense

Estrada identifies other areas of his legal representation he argues are instances of unconstitutional IAC, with even more deficient showings on the required elements to satisfy either prong of the Strickland standard. First, he faults his trial counsel for not presenting his defense to the assault charges in the detailed manner scripted by Estrada. (FAP 88-89, ECF No. 74.) However, not only is such a purported right not supported by any authority, but also his version of events was actually presented verbatim to the jury in the form of extensive readback of his own testimony from the first trial, mooting any such complaint.

Estrada also alleges IAC based on counsel's decision to call his brother, Alfredo Estrada, Jr., to testify at the second trial for impeachment and specialized knowledge purposes. (FAP 88, ECF No. 74.) Estrada argues he "objected" to his defense counsel's use of his brother because "Alfredo[] had a felony record," he wanted counsel to hire an "expert witness" instead, but counsel "went against

1    Defendant's objection and the later events happen[ed] with the marijuana, arrest and in the presence

2    of the jury." (Id..)

3         Alfredo, like his brother, was an acquaintance of the Oceguera family and had percipient

4    knowledge of the Oceguera's property, in particular the door leading into the garage (where he testified

5    he had gone many times to party and do drugs), which he testified he had helped repair on a number

6    of occasions. Alfredo also had some specialized knowledge of doors acquired through his profession

7    as a carpenter. (*See* RT vol. 14 of 23 at 2153-2155; *see also* RT vol. 15 of 23 at 2287-2290, 2307-

8    2311, 2321-2324.) The prosecutor objected when defense counsel began to ask Alfredo technical

9    questions regarding the effect on door hardware if the door were to be forced open in a particular

10   manner as calling for an expert opinion. (RT vol. 15 of 23 at 2324.) Proceedings were then

11   interrupted for a 402 hearing. (Id. at 2324-2328.) Over prosecution objection, the court ruled:

12        Based on this 402 hearing, the court finds that there has been a minimal foundation to
         establish that this individual has special knowledge, skill or experience to allow him
13        to render an expert opinion that would be of assistance to the jury, and also looking at
         CALJIC 2.81 [Opinion Testimony of Lay Witness] on expert opinion and also
14        Evidence Code section 720. [¶] And CALJIC 2.82, the People can obviously cross in
         terms of the extent of his expertise.
15
     (RT vol. 15 of 23 at 2328.)
16
17        Estrada does not challenge the content of his brother's technical or percipient testimony.

18   Rather, before Alfredo was excused as a trial witness, the prosecutor pointed out a partially smoked

19   marijuana cigarette in the band of his hat. (*See* RT vol. 15 of 23 at 2331-2337.) Proceedings were

20   held outside the jury's presence to resolve whether the prosecutor would be permitted to argue to the

21   jury an inference that Alfredo recently used the drug and that it may have affected his testimony. (Id.

22   at 2338.) After considerable discussion, the court found sufficient foundation to permit that limited

23   use of the evidence, permitted the exhibit to be marked, and arranged for separate counsel to advise

24   Alfredo, who ultimately decided he wanted to continue his testimony. (Id. at 2357-2358, 2360.) The

25   court and counsel agreed that Alfredo would not be cited for that infraction in the jury's presence.

26        Alfredo testified within the circumscribed scope set by the court and denied he had used

27   marijuana that day. (RT vol. 15 of 23 at 2361-2362.) However, rather than allow him to exit the

28   courtroom at the conclusion of his testimony, the bailiff stopped him in the presence of the jury and

1    escorted him into the back hallway, holding a citation in his hand. At defense counsel's request, the

2    court instructed the jury they should not consider anything that happened after Alfredo finished

3    testifying. The court also gave CALJIC 2.23.1 (Believability of a Witness -- Commission of a

4    Misdemeanor) due to that infraction. (Lodg. No. 16, CT vol. 2 of 3 at 216.) While unfortunate,

5    Alfredo's poor judgment leading to the incident Estrada attempts to attribute to IAC of trial counsel

6    was entirely unforeseeable and certainly not imputable to any act or omission of his attorney. Like his

7    other IAC claims, this one is without merit.

8        In summary, Estrada relies for his IAC claims solely on counsel's strategic decisions respecting

9    the marshaling of evidence and the conduct of the defense with which he simply disagrees. None

10    satisfies the <u>Strickland</u> standards. Courts resolving IAC claims assess only whether the choices

11    counsel actually made were reasonable, not whether other choices might also have been made.

12    <u>Siriprongs</u>, 133 F.3d at 736. Relief on Ground Eight should be **DENIED**.

13        **K.**    <u>**Cumulative Error**</u>

14        Although he does not present a claim of "cumulative error" as a separate ground for relief,

15    Estrada asserts that "cumulative error" in connection with his Ground Six and Ground Seven claims

16    warrants "reversal" due to "miscarriage of justice." (FAP 82, ECF No. 74.) He relies for that

17    contention on a distinguishable state law case, <u>People v. Hill</u>, 17 Cal.4th 800 (1998) (reversing a

18    conviction and sentence in a capital murder case fraught with several instances of seriously prejudicial

19    misconduct, none of which bears any resemblance to Estrada's circumstances).

20        The Ninth Circuit recognizes that the combined effect of discrete trial errors can sometimes

21    warrant federal habeas relief, even when none of them individually does. *See* <u>Parle v. Runnels</u>, 505

22    F.3d 922, 927 (9th Cir. 2007), *citing* <u>Chambers v. Mississippi</u>, 410 U.S. 284,] at 298, 290 n. 3, 302-03

23    (1973); *see also* <u>Alcala v. Woodford</u>, 334 F.3d 862, 882-83 (9th Cir. 2003). However, a cumulative

24    prejudice claim necessarily presupposes that the Court will find that substantial error occurred in

25    connection with at least two claims. *See* <u>Hayes v. Ayers</u>, 632 F.3d 500, 524 (9th Cir. 2011) ("Because

26    we conclude that no error of constitutional magnitude occurred, no cumulative prejudice is possible"),

27    *citing* <u>United States v. Larson</u>, 460 F.3d 1200, 1217 (9th Cir. 2006) (rejecting cumulative error claim

28    where the court "discovered no error" in the defendants' trial). If the Court adopts the

62

1  recommendations herein to reject all of Estrada's claims on the merits, "there is no single constitutional

2  error in this case, [so that] there is nothing to accumulate to a level of a constitutional violation."

3  Mancuso v. Olivarez, 292 F.3d 939, 957 (9th Cir. 2002).

4       For all the reasons discussed above, it is recommended that the Court find, under independent

5  or *de novo* review, that Estrada's grounds for relief raise no federal constitutional concern authorizing

6  this Court to disturb his convictions.  Even if the Court were to determine a constitutional violation

7  occurred, Estrada must still satisfy the Brecht prejudice standard as to each such instance, Baines, 204

8  F.3d at 977, a demonstration he fails to substantiate.  It is recommended that the Court find that

9  Estrada is not in custody in violation of federal law under any of his FAP theories.  Accordingly, the

10  Petition should be **DENIED** in its entirety.  28 U.S.C. § 2254(a).

11  **III.**   **CONCLUSION AND RECOMMENDATION**

12       The Court submits this Report and Recommendation to United States District Judge Dana M.

13  Sabraw under 28 U.S.C. § 636(b)(1) and Local Civil Rule HC.2 of the United States District Court for

14  the Southern District of California.  For all the foregoing reasons, **IT IS RECOMMENDED** that this

15  habeas Petition be **DENIED** in its entirety as the petitioner is not in custody in violation of any federal

16  right, and that petitioner's request for an evidentiary hearing be **DENIED**.  **IT IS FURTHER**

17  **RECOMMENDED** the Court issue an Order (1) approving and adopting this Report and

18  Recommendation and (2) directing that judgment be entered denying the Petition.

19       **IT IS HEREBY ORDERED** that no later than **30 days from issuance of this Order**, any

20  party to this action may file written objections with the Court and serve a copy on all parties.  The

21  document should be captioned "Objections to Report and Recommendation."  **IT IS FURTHER**

22  **ORDERED** that any Reply to the Objections shall be filed with the Court and served on all parties no

23  later than **ten days after being served with the objections**.  The parties are advised that failure to file

24  objections within the specified time may waive the right to raise those objections on appeal of the

25  Court's Order.  *See* Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998); Martinez v. Ylst, 951 F.2d

26  1153, 1157 (9th Cir. 1991).

27  **DATED:** January____*28*____, 2014

                               KAREN S. CRAWFORD

28                                 United States Magistrate Judge

10cv2014-DMS(KSC)